JO ANN FORMAN, INC., et al,    )
                               )
        Plaintiffs/Appellees,  )        Appeal No.
                               )        01-A-01-9805-CH-00260
v.                             )
                               )        Marion Chancery
NATIONAL COUNCIL ON            )        No. 6068
COMPENSATION INSURANCE,        )
INC., et al,                   )
                               )
        Defendants/Appellants. )

**FILED**

September 29, 1999

Cecil Crowson, Jr.
Appellate Court Clerk

COURT OF APPEALS OF TENNESSEE

APPEAL FROM THE CHANCERY COURT FOR MARION COUNTY,
AT JASPER, TENNESSEE

THE HONORABLE THOMAS A. GREER, JR., SPECIAL CHANCELLOR

JOHN W. MURREY, III
HUGH J. MOORE, JR.
DOUGLAS E. PECK
JERRY H. SUMMERS
JIMMY F. RODGERS, JR.
Chattanooga, Tennessee
 ATTORNEYS FOR PLAINTIFFS/APPELLEES

JOHN KNOX WALKUP
DENNIS J. GARVEY
MICHAEL BASSHAM
GEORGE S. BELL, III
Nashville, Tennessee
 ATTORNEYS FOR STATE OF TENNESSEE

SHELBY R. GRUBBS
PAMELA BLASS BRACHER
T. MAXFIELD BAHNER
GARY D. LANDER
Chattanooga, Tennessee
 ATTORNEYS FOR DEFENDANTS/APPELLANTS

E. CLIFTON KNOWLES
Nashville, Tennessee
 ATTORNEY FOR AMERICAN INSURANCE
 ASSOCIATION, ALLIANCE OF AMERICAN
 INSURERS AND NATIONAL ASSOCIATION
 OF INDEPENDENT INSURERS

REVERSED AND REMANDED

WILLIAM B. CAIN, JUDGE

# O P I N I O N

The sole question presented by this appeal is whether or not workers' compensation insurance, which is an intangible contract right or service, is an "article" or "product" subject to the Tennessee antitrust statutes (Tennessee Code Annotated sections 47-25-101 and 47-25-103-109). If this "intangible" is within the purview of the act, then the trial court was correct in overruling the Rule 12 motion of the defendants. If such "intangible" is not within the purview of the statute, the Rule 12 motion is well taken and the trial court judgment must be reversed. For the reasons that follow, we find that the Tennessee antitrust statutes do not apply to workers' compensation insurance. Accordingly, the trial court's decision must be reversed.

## I.   STANDARD OF REVIEW

This case is before the court of appeals on an interlocutory appeal from the judgment of the chancellor in denying the defendants' Rule 12.02(6) motion to dismiss for failure to state a claim for which relief can be granted. Such a motion is to test the sufficiency of the complaint and dismissal is warranted only when no set of facts would entitle the plaintiff to relief. On such motion, the reviewing court must take all the well pleaded material factual allegations as true and construe the complaint liberally in favor of the plaintiff. *Stein v. Davidson Hotel Co.*, 945 S.W.2d 714, 716 (Tenn. 1997).

## II.   FACTS

The Tennessee Workers' Compensation Law requires all employers, with certain limited exceptions, to pay compensation for the death, disablement or injury of their employees. Employers must fund those benefits, either by purchasing workers' compensation insurance, or by qualifying to self-insure. Tenn. Code Ann. §50-6-103 (1991), §56-2-201(2)(L)(Supp. 1998). Workers' compensation insurance policies are contracts between the insurer and the employer, by which the insurer, in return for a premium, agrees to indemnify the employer against all liabilities arising under the workers' compensation law.

The insurer also agrees to provide certain services ancillary to the promise to indemnify, such as issuance of policies, loss control advice and administration of claims.

Employers purchase workers' compensation insurance in either the voluntary market or the residual (or assigned risk) market. In the voluntary market, insurers voluntarily and unilaterally decide which employers they wish to underwrite. Those employers that are unable to obtain coverage in the voluntary market purchase their insurance in the residual market pursuant to a plan approved by the Commissioner of Commerce and Insurance in which all carriers are required to participate as an insurer of last resort. *See* Tenn. Code Ann. § 56-5-314(c)(Supp. 1998).

The residual market mandate exposes insurers to significant risk because employers insured in that market typically have adverse loss experience. In order to minimize these risks and satisfy their residual market obligations, many insurers in Tennessee (as in other states) have entered into a contractual arrangement known as the National Workers' Compensation Reinsurance Pool ("the Pool"). Under this arrangement, certain carriers, known as "servicing carriers," write policies for residual market insureds which are then reinsured by the Pool's participating companies. Like carriers in the voluntary market, servicing carriers investigate and pay claims and provide loss control and other services to their insureds. The companies participating in the Pool pay the servicing carriers a "servicing carrier allowance" as reimbursement for their expenses in providing these insurance services, plus a reasonable profit.[1]

## III. ISSUE

Plaintiffs in this lawsuit are various corporations which have purchased workers' compensation insurance. They have brought this class action on behalf of "all employers . . . who purchased workers' compensation insurance in

---

[1]The preceding statement of facts not in dispute are copied from Defendants/Appellants' brief. It is noted that the "reasonablness" of service carrier profit is the factual question about which Plaintiffs complain.

Tennessee since January 1, 1985." Defendants are thirteen workers' compensation insurers doing business in Tennessee, a national workers' compensation rate service organization licensed in Tennessee, and a national workers' compensation reinsurance pool (referred to above as "the Pool") also operating in Tennessee.

Against the undisputed factual background outlined above, Plaintiffs complain that Defendants entered into an agreement to inflate workers' compensation insurance rates by charging an excessive servicing carrier allowance. They allege that "[D]efendants and their co-conspirators combined, conspired and agreed together to establish unreasonably high and noncompetitive servicing carrier compensation." They assert that Defendants should have determined the allowance by competitive bidding rather than using an NCCI formula based on actual insurer expenses. Since Plaintiffs, as insureds, do not pay the service carrier allowance, they do not allege direct injury by reason of the excessive allowance. They contend that the excessive allowance was passed through to rate payers in the form of higher rates with the result that employers in Tennessee, in both the voluntary and residual markets, have been injured by paying excessive premiums for workers' compensation insurance. They further allege that the excessive allowance increased the deficit in the residual market which deficit in turn was assessed against the Pool participating companies. This caused these companies to reduce their underwriting in the voluntary market thus forcing more employers to obtain coverage in the residual market at higher rates. Plaintiffs seek recovery for the full amount of the allegedly excessive premiums they were charged for their workers' compensation insurance policies.

The provisions in the Trade Practices Act which are material to this case are as follows:

> All arrangements, contracts, agreements, trusts or combination between persons or corporations made with a view to lessen, or which tend to lessen, full and free competition in the importation or sale of articles imported into this state, or in the manufacture or sale of articles of domestic growth or domestic raw material, and all arrangements, contracts, agreements, trusts, or combinations between persons or corporations designed, or which tend, to

4

advance, reduce, or control the price or the cost to the producer or the consumer of any such product or article, are declared to be against public policy, unlawful and void.

Tenn. Code Ann. § 47-25-101 (1995).

> Any person who is injured or damaged by any such arrangement, contract, agreement, trust, or combination described in this part may sue for and recover, in any court of competent jurisdiction, from any person operating such trust or combination, the full consideration or sum paid by the person for any goods, wares, merchandise or articles, the sale of which is controlled by such combination or trust.

Tenn. Code Ann. § 47-25-106 (1995).

The case turns entirely on whether or not increased costs of workers' compensation insurance involves a "product or article" within the meaning of Tennessee Code Annotated section 47-25-101. The critical phraseology of the statute has remained unchanged since 1903, and reported cases dealing with this subject are few and far between. Plaintiffs rely heavily on certain language in the opinion of the supreme court in *Standard Oil Co. v. State*, 117 Tenn. 618, 643, 100 S.W. 705, 711 (1907):

> The Legislature clearly intended to prohibit trusts, combinations, and agreements affecting all commerce not covered by the federal statute, and upon which it had a right to legislate. It did not intend to stop short of its power or to exceed it.

Defendants insist that this expansive language in *Standard Oil* is obiter dictum and that the supreme court case of *McAdoo Contractors, Inc. v. Harris*, is determinative. In *McAdoo*, the court held as follows:

> We think it clear upon reading T.C.A. § 69-101 that it has no application under the facts and circumstances of this case. The statute in express terms applies to *articles* of foreign and domestic origin, so that it would be virtually impossible to bring under the statute a case involving only the award of a building construction contract. It would seem the statute would in such case apply only to an unlawful effort to control the price of the building material, and not to the award of the contract where control of cost of articles was not a factor.

222 Tenn. 623, 631, 439 S.W.2d 594, 597 (1969).

5

The supreme court has held that "[o]biter dictum does not control the decision in a subsequent suit when the point which was obiter dictum is, in a subsequent case, presented for decision. Statements contained in an opinion are authority in subsequent cases 'on only the point in judgment arising in the particular case before the Court.' " *Bomar v. State,* 312 S.W.2d 174, 178 (Tenn. 1958) (citations omitted). Further expressing the basis of this long settled rule, the supreme court stated the law as follows:

> In the case of *State ex rel. Pitts v. Nashville Baseball Club*, 127 Tenn. 292, 307, 154 S.W. 1151, 1155, the Court through Mr. Justice Green, later Chief Justice, said:
> "It is a familiar principle that stare decisis only applies with reference to decisions directly upon the point in controversy. Only the points in judgment arising in a particular case before the court are precedents for future decisions. The Supreme Court of the United States has said: 'Doubtless the doctrine of stare decisis is a salutary one and to be adhered to on all proper occasions; but it only arises in respect of decisions directly upon the points in issue.' "
> It is familiar law that a decision is authority for the point or points decided, and nothing more, and that general expressions in an opinion are to be taken in connection with the case in which they were used, and when they go beyond that, they are not authority for another case.
> The words of Mr. Chief Justice Marshall expressed in the case of *Cohens v. Commonwealth of Virginia*, 6 Wheat 264, 398, 19 U.S. 264, 398, 5 L.Ed. 257, 290, are also applicable when he said: "It is a maxim not to be disregarded, that general expressions, in every opinion, are to be taken in connection with the case in which those expressions are used."

*Shousha v. Matthews Drivurself Serv., Inc.*, 210 Tenn. 384, 389-90, 358 S.W.2d 471, 473-74 (1962) (citations omitted).

The *Standard Oil* case involved a two count criminal indictment for antitrust violations under what is now Tennessee Code Annotated sections 47-25-101 and 103-109. The item being sold was a quantity of coal oil which no one could successfully assert was not a "product or article" as defined in section 47-25-101. The previous quotation herein from *Standard Oil* must be considered in the context in which it was made:

> The Legislature was cognizant, we must presume, that it had no power to enact laws regulating interstate commerce, and did not intend to enact an unconstitutional law, in whole or in part. There was already then in force an act of Congress, the Sherman antitrust act, enacted in 1890, fully covering that subject, the provisions of

which were much broader and more effective than those of this act, and could be enforced to their fullest extent by the stronger and more vigorous government. There was neither the power nor the necessity for enacting any legislation relative to interstate commerce. The wrongs to trade which were intended to be corrected and punished were those being perpetrated against commerce within the state, which Congress could not reach, and for which there was then no efficient remedy.

. . .

. . . The Legislature clearly intended to prohibit trusts, combinations, and agreements affecting all commerce not covered by the federal statute, and upon which it had a right to legislate. It did not intend to stop short of its power or to exceed it.

*Standard Oil*, 100 S.W. at 710-11.

The Sherman Antitrust Act from its enactment in 1890 has provided in pertinent part: "Every contract, combination ... or conspiracy, in restraint of trade or commerce among the several states ... is declared to be illegal." 15 U.S.C. § 1 (1995). To give to the Tennessee Trade Practice Act the expansive effect asserted by dictum in *Standard Oil* would require a holding that "trade or commerce" as used in the Sherman Act and "such product or article" as used in Tennessee Code Annotated section 47-25-101 are synonymous phrases.

In *Standard Oil*, the conviction of one of the appellants, Mr. Holt, was affirmed by the supreme court not because of such purported expanded scope of section 47-25-101 but rather on the indisputable fact that quantities of coal oil were "articles" within the plain meaning of the statute. The expanded scope discussion was not necessary to the decision in the case and it is not binding precedent. *See Rush v. Chattanooga DuPont Employees Credit Union*, 210 Tenn. 344, 358 S.W.2d 333 (1962).

The same quantities of coal oil came back to haunt Standard Oil again in *State v. Standard Oil Co.*, 120 Tenn. 86, 110 S.W. 565 (1908), *aff'd*, 217 U.S. 413, 30 S.Ct. 543, 54 L.Ed. 817 (1910). In that case, the State sought successfully a perpetual injunction restraining Standard Oil from doing intrastate business within the state of Tennessee. This injunctive action was based upon the same facts and the same quantities of coal oil as had formed the predicate for

the conviction of Mr. Holt in *Standard Oil Co. v. State*, 117 Tenn. 618, 100 S.W.705 (Tenn. 1907). This second supreme court opinion, which we can call "*Standard Oil II,*" reiterated the same dicta as to the scope of what is now Tennessee Code Annotated section 47-25-101 as was asserted in "*Standard Oil I.*"

It simply cannot be successfully argued consistent with the plain meaning of the English language that "product or article" and "trade or commerce" are synonymous terms. The distinctions between such terminology are sharply drawn in the analogous case of *SouthTrust Corp. v. Plus Sys., Inc.*, 913 F.Supp. 1517 (N.D. Ala. 1995). Alabama Code section 8-10-1 prohibited actions designed "to regulate or fix the price of any article or commodity." Alabama Code section 8-10-3 prohibited efforts to "restrain or attempt to restrain the freedom of trade or production ." SouthTrust Corporation was a registered bank holding company providing banking services in Alabama, Florida and other states and was a member of the Plus Systems, Inc. network. Plus Systems, Inc. was organized to administer a national network of automated teller machines. As a part of the contract between SouthTrust and Plus Systems, SouthTrust was prohibited from surcharging for use of ATMs. SouthTrust brought suit charging a conspiracy between Plus Systems, Inc. and certain of its licensees for alleged antitrust violations under the Sherman Antitrust Act and also under Alabama Code sections 8-10-1 and 8-10-3.

After strongly questioning the standing of SouthTrust to sue under section 4 of the Clayton Act, 15 U.S.C. § 15, the court assumed the plaintiff to have standing and analyzed the claim of SouthTrust in response to a motion for summary judgment filed by Plus Systems. The court first decided that the contract was not "per se illegal" under the Sherman Act. *See Northern Pac. Ry. v. United States*, 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958). This left only a "rule of reason" analysis under the Sherman Act. *See National Bancard Corp. (NaBanco) v. Visa U.S.A., Inc.,* 596 F.Supp. 1231, 1259 (S.D. Fla. 1984), *aff'd.*, 779 F.2d 592, 598-603 (11th Cir. 1986), *cert. denied*, 479 U.S. 923, 107 S.Ct. 329, 93 L.Ed.2d 301 (1986). In sustaining the motion for summary judgment of Plus Systems, the court held:

> In *NaBanco*, the Eleventh Circuit upheld the lower court's finding that even if VISA had market power in the relevant market, the interchange fee was procompetitive, and thus not illegal under a rule of reason analysis. *NaBanco*, 779 F.2d 592, 605. The court in *NaBanco* accepted VISA's argument that the credit card processing service was a joint venture-type enterprise in which the interchange fee acted as an internal control mechanism that yielded procompetitive efficiencies that its members could not create acting alone. *NaBanco*, at 604. The same analysis applies here. The no-surcharge rule challenged in the present case creates similar economic efficiencies. There must be an advance agreement--a system-wide rule governing payment for network transactions--in order to have a system. The joint venturers who join to create the network agree in advance on the pricing of the system and the revenues' distribution in order to lend stability to the system. The no-surcharge rule creates price certainty, so that customers do not have to spend large amounts of time seeking the lowest fee for an ATM transaction.

*SouthTrust Corp.,* 913 F.Supp. at 1524. Thereafter, the court disposed of the Alabama state claims in a manner that clearly articulates the distinction between "articles or commodities" on the one hand and "freedom of trade" on the other.

> SouthTrust has asserted claims against Plus under Alabama Code §§ 8-10-1 and 8-10-3. Section 8-10-1 provides that persons who engage or agree with other persons to regulate or fix the price of articles or commodities shall be liable. The ATM services challenged in the present case are not articles or commodities, and thus do not fall within the ambit of § 8-10-1. Section 8-10-3 provides in part that persons or corporations which restrain the freedom of trade or production, or attempt to destroy competition shall be liable. According to this court's analysis, *supra*, that Plus does not have sufficient market power and that the challenged restraint is ultimately pro-competitive, SouthTrust's claim that the regulations violate § 8-10-3 also fail as a matter of law.

*Id.* at 1525.

Just as ATM services do not qualify as "articles or commodities" under the Alabama statute, so insurance premiums do not qualify as "product(s) or article(s)" within the meaning of Tennessee Code Annotated section 47-25-101. Such is precisely in keeping with the holding of the supreme court in *McAdoo Contractors, Inc. v. Harris*, 222 Tenn. 623, 439 S.W.2d 594 (1969). In *McAdoo*, Carroll County invited bids for the construction of a warehouse to be leased to Henry I. Siegel Company, Inc. McAdoo Contractors, Inc. was the low bidder but Carroll County decided instead to award the contract to the next low

bidder, Forcum-Lannom, Inc., such award being strongly recommended to the county by Henry I. Siegel Company. McAdoo Contractors then filed suit against the county, its architect, and the county judge, together with Henry I. Siegel Company, Inc. and Forcum-Lannom, Inc., alleging that they fraudulently conspired to deprive the complainant of a contract and that they had entered into a combination in restraint of trade, contrary to Tennessee Code Annotated section 69-101 which is now codified at section 47-25-101.

The trial court sustained a plea in abatement by the county judge and demurrers by all other defendants. On appeal, the supreme court found the allegations of fraud and conspiracy to be insufficient in law. Turning to the allegations of combination in restraint of trade, the supreme court held:

> We think it clear upon reading T.C.A. § 69-101 that it has no application under the facts and circumstances of this case. The statute in express terms applies to *articles* of foreign and domestic origin, so that it would be virtually impossible to bring under the statute a case involving only the award of a building construction contract. It would seem the statute would in such case apply only to an unlawful effort to control the price of the building material, and not to the award of the contract where control of cost of articles was not a factor.
>
> On the basis of the well pleaded facts, the sole reason McAdoo did not get the contract, was not because of arrangements or agreements with respect to competition in articles of foreign or domestic origin, but because Carroll County had reserved to itself the right to award it to any bidder it might choose. And acting under this reservation, the contract was awarded by Carroll County to Forcum-Lannom, which its responsible advisers thought to be more experienced.
>
> Before the statute could apply, it would be necessary to find and hold that this kind of contract provision has been outlawed by this Code section. But this is so obviously not the case that even complainant does not make this contention.

*McAdoo*, 439 S.W.2d at 597-98.

Naturally the position of Plaintiffs is that the *McAdoo* treatment of section 69-101, now section 47-25-101, is dictum. Such is not the case, however, as the applicability of the statute was directly in issue in the alternative allegations of the complaint as to combination and restraint of trade. The supreme court has held:

> It is said by [the plaintiff] that the holding above quoted is dictum since it was not necessary to a decision of the case. (It had been decided that the seven year statute of limitations applied.) However, the question of equitable estoppel was fairly raised. Therefore, the above decision embodied in the above quotation was not dictum. In the case of *McFarland v. Bush*, 94 Tenn. 538, 542, 29 S.W. 899, 900, 27 L.R.A. 662, 45 Am.St.Rep. 760, this Court, in passing upon the same insistence as here made said: "Two or more questions properly arising in a case under the pleadings and proof may be determined, even though either one would have disposed of the entire case on its merits without the other, and neither holding will be a dictum so long as it is properly raised and considered."

*Daugherty v. Toomey*, 189 Tenn. 54, 222 S.W.2d 197, 199 (1949). In *Porter v. Lee,* 88 Tenn. 782, 14 S.W. 218, 220 (1890), the supreme court said:

> This language is none the less an adjudication, and binding as such, because another question conclusive of the case was considered and decided in an earlier part of the opinion. That other question and the construction of the statute were alike before the court, and the decree was based upon both grounds. As to both, the decision was a legitimate adjudication; as to neither was it a mere *dictum.*

Again, in *Bates v. Taylor,* 87 Tenn. 319, 11 S.W. 266, 267 (1889), the supreme court held:

> But it is now argued that so much of the opinion in that case as relates to the question of jurisdiction was *obiter dictum*, because the question decided in an earlier part of the opinion was conclusive of the case. This cannot be so. Both questions were fairly raised by the record, and the fact that the question of jurisdiction was discussed last does not make it any the less entitled to the force of an adjudication.

Finally, in *Bush v. McFarland*, 94 Tenn. 538, 29 S.W. 899, 900 (1895), the supreme court held:

> It is said this decision is a dictum on this point, the argument being that there were other questions involved in it, upon which the decision could have been and would have been rested. Grant this to be so. It does not make the holding and opinion in that case a dictum. The question was fairly and directly involved, fully considered, and deliberately passed upon. The fact that the decision may have been rested on a different ground, even though one more satisfactory, does not place the decision in the category of a dictum, if the question was fairly raised and duly considered and decided... .

11

The difference in *obiter dictum* status between *Standard Oil* and *McAdoo*, lies in the fact that the scope of Tennessee Code Annotated section 47-25-101 was not in issue in *Standard Oil,* but was directly in issue in *McAdoo.*

The position of the Attorney General of Tennessee as *amicus curia*, when one cuts through the verbiage and gets to the heart of its brief, is that Tennessee Code Annotated sections 47-25-101 and 103-109 is an intrastate Sherman Act. The only real authority for this position is the *Standard Oil I* dicta asserting the same thing. In his brief, the Attorney General states:

> Since its inception, the scope of Trade Practices Act, Tenn. Code Ann. §§ 47-25-101, *et seq.*, has been construed by Tennessee courts to cover all manner and form of intrastate commerce, whether tangible or intangible. The Trade Practices Act covers: "Every conceivable ... agreement or contract made to lessen or destroy competition and control prices." *Standard Oil Co. v. State*, 100 S.W. 705, 716 (Tenn. 1907). The broad language of the Trade Practices Act has been expansively interpreted by Tennessee courts.

Except for thirteen separate citations of *Standard Oil*, the Attorney General has been no more successful than any of the other parties in citing Tennessee cases "expansively" construing what is a "product" or an "article" within the meaning of Tennessee Code Annotated section 47-25-101. Research by this court has met a similar fate.

As the official charged with the responsibility of enforcing the Trade Practices Act in Tennessee, the Attorney General would be far more free to act if the Trade Practices Act were indeed an intrastate Sherman Act. The present position of the Attorney General is somewhat compromised by Attorney General opinion 82-455 of October 5, 1982, wherein he asserts, in part: "The provisions of Tenn. Code Ann. § 69-101 may likewise be used, but we note that our supreme court has indicated that Section 69-101 does not apply to intangibles. *McAdoo Contractors, Inc. v. Harris*, 222 Tenn. 623, 439 S.W.2d 594 (1969)."

Since *McAdoo* was decided in 1969, many separate attempts have been made in the General Assembly to amend the Trade Practices Act in order to expand its scope. In 1975 three different bills were introduced (HB207/SB254;

HB1072/SB1062; HB1329/SB1351). In 1978 HB2366 was introduced. In 1986 SB1406/HB1979 was introduced. In 1987 SB540/HB694 was introduced. Proposed House Bill No. 2366, introduced in the General Assembly in 1978, would have expressly added "services" to section 47-25-101. Senate Bill No. 1406, proposed in 1986, would have broadened the act to include "trade or commerce" defined as "all forms of economic activity." Senate Bill No. 540, introduced in 1987, would have accomplished the same purpose. In debate before the Senate Commerce Committee on March 4, 1986, relative to Senate Bill No. 1406, the sponsor thereof, Senator Douglas Henry, observed in part:

> What we have here, Mr. Chairman, in Senate Bill 1406, is the work product of the Committee of the Tennessee Bar Association representing both those who sue and those who are sued, put together and carefully ground out and hashed over a period of time in framing this bill, with the positive assistance and participation of General Doug Berry of our Attorney General's Office, who is the deputy in charge of antitrust litigation in that office.

In *Hamby v. McDaniel*, 559 S.W.2d 774, 776 (Tenn. 1977) (citations omitted), our supreme court made the following statement:

> The legislature is presumed to know the interpretation which courts make of its enactments; the fact that the legislature has not expressed disapproval of a judicial construction of a statute is persuasive evidence of legislative adoption of the judicial construction, especially where the law is amended in other particulars, or where the statute is reenacted without change in the part construed.

Applying this principle to the case at hand, the General Assembly has been presented with four opportunities to alter the *McAdoo* decision's construction of Tennessee Code Annotated section 47-25-101 and has declined to do so on each of these occasions. We acknowledge that unsuccessful attempts at legislation are not the best guides to legislative intent," *Red Lion Broadcasting Co. v. FCC*, 395 U.S. 367, 382 n.11, 89 S.Ct. 1794, 1802 n.11, 23 L.Ed.2d 371 (1969), and the "amendment rejection" theory is a minority view, *see State v. Bell*, 720 A.2d 311, 317 (Md. App. 1998); *Freeman v. Jefferson County*, 334 So.2d 902, 905 (Ala. 1976). However, all of the legislative efforts in the Tennessee General Assembly were totally unnecessary if the present Trade Practices Act covers "every conceivable ... agreement or contract to lessen or destroy competition and control prices," as the Attorney General asserts in brief

13

relying solely upon *Standard Oil I.* Courts have held that nonaction by a legislative body may be a dubious guide but may become significant where proposals for legislative change have been repeatedly rejected. *Bob Jones Univ. v. United States*, 461 U.S. 574, 600-01, 103 S.Ct. 2017, 2032, 76 L.Ed.2d 157 (1983); *Brown v. Secretary of Health and Human Servs.*, 46 F.3d 102, 108 (1st Cir. 1995); *West Virginia Ass'n of Community Health Ctrs, Inc. v. Sullivan*, 737 F.Supp. 929, 940 (S.D.W.Va. 1990).

## IV.  CONCLUSION

In the final analysis, this case, exhaustively and brilliantly briefed by all parties, is controlled by *McAdoo Contractors, Inc. v. Harris*, 439 S.W.2d 594 (Tenn. 1969). To paraphrase Justice Humphreys therein, it is clear that Tennessee Code Annotated section 47-25-101, in express terms, applies to articles of foreign and domestic origin so that it would be virtually impossible to bring under the statute  workers' compensation insurance, which is an intangible contract right or service. The judgment of the trial court is therefore reversed and the case dismissed with costs assessed against the appellees.

_____
WILLIAM B. CAIN, JUDGE

CONCUR:

_____
BEN H. CANTRELL, P.J., M.S.

_____
WILLIAM C. KOCH, JR., JUDGE