**Arvil Leroy HODGE,**
**Plaintiff/Appellant,**

v.

**DIAMOND CONTAINER GENERAL INC., d/b/a Diamond Bathurst,**
**Defendant/Appellee.**

Supreme Court of Tennessee,
at Knoxville.

Oct. 24, 1988.

Larry G. Roddy, Chattanooga, for plaintiff/appellant.

Joseph C. Wilson, III, Spears, Moore, Rebman & Williams, Chattanooga, for defendant/appellee.

## OPINION

O'BRIEN, Justice.

This appeal is from dismissal of a workers' compensation petition. The plaintiff suffered brain damage and is totally and permanently disabled. There are factual issues involved here and the scope of review by this Court is "de novo upon the record of the trial court, accompanied by a presumption of the correctness of the finding, unless the preponderance of the evidence is otherwise." T.C.A. § 50-6-225(e). The memorandum opinion of the trial judge substantially stated the essential evidence and we summarize from that opinion:

In January of 1986, the plaintiff was 46 years of age and was employed as a truck driver for the defendant. He had been with the defendant, or its predecessor, some 20 years. Based upon the record, the plaintiff had no prior heart troubles and was in good physical condition. On January 27, 1986, it was very cold in Chattanooga and, according to some of the testimony, it was the coldest day of the year and it was 11 degrees

Fahrenheit outside. Plaintiff had gone to work at 7:00 and worked without difficulty until he took a morning break at approximately 9:00 a.m. At that time, he took a sandwich and an apple to the break room and was observed eating the sandwich. Prior to the break, he had hooked his tractor up to a trailer that had to be moved a short distance from the loading dock. After the break, he continued and with another worker signaling him, he moved the trailer forward to the correct position. In the usual course of events, he would have jacked the trailer dolly down, disconnected the air lines, and removed the pin at the 'fifth wheel.' However, no witnesses were found who observed the plaintiff for the next ten to fifteen minutes. He was next seen lying flat on the grass on his back. Workmen rushed to him and they heard choking and rattling sounds in the plaintiff's chest. Medical assistance was called for and the co-employees tried to assist the plaintiff as best they could. Apparently, someone attempted CPR. However, his pulse dropped and upon the arrival of an EMT the plaintiff's heart was in ventricular fibrillation and he was essentially pulseless and non-breathing. CPR was administered and they brought him back to a sinus rhythm with the appropriate pulse and blood pressure.

There were other evidentiary findings made by the trial court which are essential to a proper resolution of this matter. He reviewed the testimony of several of plaintiff's co-workers. One of these persons testified that it "seemed" as if the [trailer] dolly was down and the air hoses were disconnected. There was circumstantial evidence that there had been some difficulty with the pin on the fifth wheel of that particular tractor. There was testimony that sometimes in cold weather it is difficult to remove the pin [when disconnecting the tractor from the trailer].

At the conclusion of the hearing the chancellor was not satisfied that the plaintiff had carried the burden of proof. Exercising an abundance of caution he elected, under the provisions of T.C.A.

§ 50–6–204(d)(5), to appoint a neutral physician to make an examination of the plaintiff and report his findings to the court.

Our review of the record indicates that the trial judge's findings and final order were based almost exclusively on the testimony of the three physicians who were called, one by the defendant, one by the plaintiff, and the third by the court.

Dr. Michael Love, a cardiologist, deposed by the plaintiff, examined Mr. Hodge on his admission to Erlanger Hospital. The history he received was that when plaintiff was found at work he was lying on the ground, "pulseless and non-breathing." When the paramedics arrived they found he was in ventricular fibrillation, which is an abnormal rhythm of the heart. The paramedics defibrillated him and brought him back to a sinus rhythm with appropriate pulse and blood pressure. Dr. Love took over his care when they brought Mr. Hodge into the emergency room. His original examination revealed Hodge was in post-cardiac and respiratory arrest and had suffered severe brain damage. After a neurological examination the doctor concluded it was a high probability that he would not recover. The brain damage was caused when his heart went into ventricular fibrillation. When he stopped breathing he had no blood flow to his brain and it was probably more than four or five minutes before someone got to him to initiate cardio-pulmonary resuscitation, and that was enough to cause brain damage. He ruled out a heart attack because of the patient's enzyme level and his electrocardiogram did not change, always showing that it was within normal limits. A CT scan of the brain was negative in reference to an aneurism. Mr. Hodge's medical history indicated he had no prior cardiac problem or history of blood pressure and otherwise was in good health. He could not relate his medical condition to anything in his past. He made three final diagnoses in his discharge summary, (1) brain damage due to lack of oxygen secondary to cardiac and respiratory arrest; (2) akinetic mutant, which he defined as totally unresponsive, an in-limbo state where the patient's eyes may open and

seem to roam around, but there are no other responses, the patient cannot talk or do anything for himself; (3) sudden death syndrome which he described as people who pass out suddenly or die suddenly from cardiac cause, such as a cardiac arrest or ventricular arrhythmia such as ventricular fibrillation or heart attacks. He could not document a heart attack by EKG or by enzymes. Sudden death syndrome sometimes is used as a term to put down when you do not know what else happened. He utilized that term in his discharge summary because of the ventricular fibrillation that was found. There were no specific findings to explain what happened to Mr. Hodge other than that he was working in an area that was cold and was doing some fairly vigorous work. He had not talked with anyone who had been present, but had tried to find out to get a better feel of what had occurred. His recollection was that there was not anyone close at the time that Mr. Hodge was stricken.

Dr. Edward F. Buchner, III, was called on behalf of the defendant. Dr. Buchner testified he was not certified in any specialty. He reviewed the hospital charts and the ambulance "trip report" pertaining to Mr. Hodge. He was asked a hypothetical question which we record in its entirety to further clarify the conditions under which Mr. Hodge was found:

"I want you to assume, . . . with respect to Mr. Arvil Leroy Hodge, that when he was found unconscious on a grassy strip at his place of employment by some of his fellow employees . . . he was choking, was rattling, his chest was rattling and choking, rattling sounds were coming from his chest, that he was perceived to have difficulty in getting his breath and breathing. I want you to assume further that there was no evidence of any bumps, any bruises, no evidence of any trauma to the head or any other part of the body. I want you to assume further that when an EMT or paramedical personnel arrived at the scene, his complexion and facial, complexion of his skin was described as being flushed. I want you to assume further that within fifteen to twenty minutes previous to that, he had been observed eating an apple and sandwich, having a cup of coffee. I want you to assume further that when taken to Erlanger Hospital and tests were run, which excluded or, at least, showed no evidence of any aneurism, any heart attack, or revealed any pathology of any particular kind at all other than that the gentleman had gone into—his heart had stopped beating or he had gone into an arrhythmia and he had stopped breathing for some period of time while on the ground waiting for the ambulance to come. Assuming all of these facts to be true, I would ask you if you have an opinion as to what problems or why Mr. Hodge became ill."

Dr. Buchner responded "well, there are little squares checked by the EMP person, apparently, who filed this report, and there is a marked flush that would point a finger towards somebody having airway obstruction, which is usually when people choke a great deal or choke to death. There is a marked flush appearance to their face rather than pale, or blue or cold or whatever. I mean, its a condition that is seen when someone is straining and fighting to get their breath when they're choking. That's what I'm basing this on. Aspirating, in other words." In response to pertinent inquiry Dr. Buchner also testified that a person in that condition might quit breathing or have normal rhythm of the heart interrupted. In response to a further hypothetical question assuming an individual straining either to lift something or straining against something, pulling against something such as a lever to pull it out, he expressed the opinion that action would not cause an individual to choke and explained the bodily functions which would take place under those circumstances. The court asked this witness several questions in reference to whether someone doing a great deal of straining or over exerting themselves in extremely cold weather would be subject to becoming nauseated. His response was generally in the negative. He expressed an unfamiliarity with the term sudden death syndrome but defined it as a circumstance where the "heart quit," say-

ing without any intervention or interruption the individual would have been the victim of sudden death. He explained that sudden death most of the time is a cardiac event-type of thing. The court asked specifically, "what normally would cause someone to regurgitate in their stomach, say five to ten minutes after eating? What are some of the causes of that?" The witness responded, "he could have spontaneously had indigestion and aspirated or vomited or tried to belch. Mainly, after eating people take rolaids and tums and everything else for that feeling all of the time and he must have just been so strong that he went ahead and threw up." Finally, the trial judge asked, "based upon the hypothetical posed to you and the time frame there, would it be your opinion that the choking was caused by vomit? To which the witness responded in the affirmative and added, "well, I think the key thing that [the EMT] spotted was this flushed expression on his face, being florid, flushed, reddish-faced instead of blue or cold or pale-type—not cold or pale." The remainder of the testimony of this witness related to the physical impact on and reaction of an individual who gets something in their throat.

Dr. Clifton R. Cleaveland was the physician appointed by the court. He stated that he had reviewed the Hodge file which consisted of the medical testimony previously admitted into evidence and the hospital chart which included the admission notes of the emergency room physician and other doctors and house staff involved in Mr. Hodge's care. He expressed the opinion that Mr. Hodge most likely had the syndrome of sudden cardiac death and explained that a patient can have a sudden cardiac arrest and following resuscitation have no evidence either on electrocardiograms or on blood work to indicate any heart muscle damage. Sudden death syndrome is due to the abrupt onset of a deadly heart rhythm abnormality, usually either ventricular tachycardia and/or ventricular fibrillation. The onset is sudden. The person characteristically, immediately drops to the ground, often times with no warning at all. It can occur in a host of

different circumstances, at rest or with activity and may even account for deaths that occur when people pass away in their sleep at night. This syndrome—when people are resuscitated and brought back to life, and have arteriograms, the most usual finding is that there is a generalized arteriosclerosis that involves the coronary arteries. After some further description of conditions creating a disposition to this syndrome he stated his opinion that this was the event that happened to Mr. Hodge. He was asked if working in very cold weather doing a strenuous task could trigger the event and responded in substance that it was difficult to say but that very cold weather can double the amount of exertion required for any activity and cold environments require one's heart and circulation in general to work much harder. He stated there is generally an increased risk of heart events at temperature extremes, very cold or very hot temperatures will put an extra strain on the heart. Temperature can be a contributing factor always. He was asked specifically if he had ruled out choking in Mr. Hodge's case. His response is repeated here verbatim:

"The evidence that I had against choking —I don't think that the patient could have had air movement with the ease at which it seemed to be described on the ambulance record and in the hospital. If the windpipe is blocked, then if the person coughs out the food, they're going to start breathing again.

But if there is a large enough food impaction in the windpipe, you're not going to be able to inflate the lungs with either a mouth-to-mouth or bag-to-mouth respirator and you're not going to be able to resuscitate the person.

Nobody described reaching into the back of the throat and pulling out a wad of food. There is no description of a vomitus filling of the mouth. The chest x-ray would also have been expected if there was an aspiration, to have been quite abnormal from the first. And the lung fields on the chest x-ray at the time of admission, a bedside chest x-ray showed clear lung fields. That's the indirect evidence that I have had against an aspiration. The fact that he could be ventilat-

ed that meant at the time the ambulance people were there, there was no obstruction in his trachea and then at the time the chest x-ray was taken a few hours later, he had clear lung fields."

There was a great deal more testimony relating to enzyme levels in relationship to the possibility of an heart attack and an explanation for the normal cardiogram readings found by Dr. Love. He concluded that within the broad category of heart attack, including the sudden cardiac death syndrome, on the basis of his review of the records, that heart attack was the most likely cause of his illness. Assuming that he did suffer a heart attack, it could have been triggered by exertion or may not have been triggered by exertion because of the unpredictable way in which the sudden cardiac death syndrome can manifest itself.

We have dwelt at length on the medical testimony because we find it dispositive of the issue involved. It is plain from an examination of the trial judge's memorandum opinion that his attention was focused on the probability that the attack suffered by Mr. Hodge was brought about by a fit of choking. He concluded that there must be some greater risk eating at the place of employment than at one's home to make such an incident compensable and that the plaintiff had failed to carry the burden of proof. Not being satisfied with the evidence at that juncture of the proceedings he appointed Dr. Cleaveland as a neutral physician to make an examination and report his findings to the court. Upon the incoming of Dr. Cleaveland's testimony he found evidence in the record that Mr. Hodge's condition arose out of and in the course of his employment. Dr. Cleaveland reported that Mr. Hodge suffered a sudden cardiac death syndrome that could have been triggered by exertion or may not have been triggered by exertion. The trial court found the doctor's testimony "marginal as to whether the injury to Mr. Hodge *would not have occurred but for his employment. Such leaves in doubt that strenuous exertion—if such occurred—accelerated the 'heart attack' which occurred.*" (Emphasis supplied). He held that the plaintiff had failed to carry the burden of proof.

We find the evidence to the contrary. The proper measure of proof is whether the injury or accident arises, out of and is incurred in the course of a claimant's employment without regard to fault as a cause of the injury. T.C.A. § 50–6–103. Summarizing the medical evidence, Dr. Love testified that Mr. Hodge suffered from brain damage secondary to cardiac and respiratory arrest. The reason for his final diagnosis of sudden death syndrome was because Hodge was found in a state of ventricular fibrillation by the emergency medical technician ambulance driver when he arrived upon the scene. Sudden death syndrome is a term utilized when people pass out from some cardiac cause among which is heart attacks. He could not document a heart attack in this case from the electrocardiogram or the enzyme level.

Dr. Buchner based his medical conclusion that Mr. Hodge had choked on food or from regurgitation largely on the ambulance driver's report of a skin color flushed appearance. However, one of the lay witnesses testified that Mr. Hodge was turning blue when the emergency medical people arrived. There is absolutely no evidence of vomiting or regurgitation or other evidence to justify Dr. Buchner's opinion that the cause of the injury was choking. There is positive evidence to the contrary.

Dr. Cleaveland expressed the opinion that Mr. Hodge most likely had the syndrome of sudden cardiac death and explained that following resuscitation, as occurred in this case, a patient can demonstrate no evidence either on an electrocardiogram or on blood work to indicate any heart muscle damage. The trial judge was ultimately convinced, as are we, that Mr. Hodge suffered from a heart attack.

There is no question that Mr. Hodge was engaged about his employer's business when the incident occurred. There is some question about the degree of exertion involved in his work however that is not decisive of the issue. "It is a settled rule of decision in this jurisdiction that an employee's death or disability which results from a heart attack that is causally related to his employment is compensable under the [W]orkers' [C]ompensation [A]ct as arising out of and in the course of his

employment, although prior to the attack, he suffered from arteriosclerotic heart disease and although the attack was produced by only ordinary exertion and usual strain of the employee's work," (citations omitted). *Flowers v. South Central Bell Telephone Company*, 672 S.W.2d 769, 770 (Tenn.1984). The Workers' Compensation Law must be rationally but liberally construed to promote and adhere to the Act's purposes of securing benefits to those workers who fall within its coverage. *Lindsey v. Smith & Johnson, Inc.*, 601 S.W.2d 923, 925 (Tenn.1980); *Turner v. Bluff City Lumber Company*, 189 Tenn. 621, 227 S.W.2d 1, 2 (1950). There is evidence to show that Mr. Hodge's work was outdoors in extremely cold weather with a chill factor of below zero. There is medical evidence that the respiratory rate and heart rate of an individual working under those conditions would increase. When an employee's work exposes him to an elemental force and requires him to continue to work under the risk of the hazard which the elemental force creates, the employee is to be compensated for injuries which result therefrom. In such case all of the factors combine to create liability. It is foreseeable that when exposed to the hot sun or the freezing cold they suffer an injury therefrom. When the nature of the work requires exposure to the risk of this hazard, any injury resulting therefrom arises out of and in the course of the employment. *Globe Company v. Hughes*, 223 Tenn. 37, 442 S.W.2d 253, 256 (1969).

The evidence preponderates against the trial court's finding that plaintiff has failed to carry the burden of proof to show his injury arose out of and was incurred in the course of his employment. The case is remanded for all further and necessary proceedings in accordance with this opinion. The costs are assessed against the defendant.

HARBISON, C.J., and FONES, COOPER and DROWOTA, JJ., concur.