IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
April 19, 2010 Session

## HARTFORD UNDERWRITERS INSURANCE CO. v. DALE PENNEY, d/b/a DLP CONSTRUCTION CO.

**Appeal from the Circuit Court for Hamilton County**
**No. 08C220      W. Neil Thomas, III, Judge**

_____

**No. E2009-01330-COA-R3-CV - FILED JUNE 17, 2010**

_____

Hartford Underwriters Insurance Co. ("Hartford") filed this suit against Dale Penney, d/b/a DLP Construction Co. ("Mr. Penney"), seeking compensation for additional workers' compensation insurance premiums, as well as court costs and service of process fees. The trial court awarded judgment in favor of Hartford for $12,316 plus costs. Hartford subsequently filed a motion seeking pre-judgment interest, which was granted after a hearing resulting in an additional award of $4,823.77. Mr. Penney appeals. We affirm in part, vacate in part and remand to the trial court for further proceedings consistent with this opinion.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court
Affirmed in Part; Vacated in Part; Case Remanded**

JOHN W. MCCLARTY, J., delivered the opinion of the Court, in which HERSCHEL P. FRANKS, P.J. and CHARLES D. SUSANO, JR., J., joined.

Douglas M. Cox, Chattanooga, Tennessee, for the appellant, Dale Penney, d/b/a DLP Construction Co.

Blakeley D. Matthews and Ben M. Rose, Nashville, Tennessee, for the appellee, Hartford Underwriters Insurance Co.

**OPINION**

I. BACKGROUND

The majority of the facts in this retrospective insurance premium audit case are undisputed and were stipulated to by the parties prior to trial. In May 2004, Mr. Penney, in

the course of his construction business, agreed to build a new home for Dexter White Construction Company ("Mr. White") in Hixson, Hamilton County, Tennessee. Pursuant to the requirements of the construction agreement with Mr. White, Mr. Penney obtained workers' compensation insurance coverage for himself, which was secured and provided by Hartford ("Hartford Policy"). The policy period was from May 8, 2004, to May 8, 2005.[1]

Mr. Penney utilized the services of four individuals during the construction of the home for Mr. White. On May 6, 2004, I-18 "Election of Non-Coverage by Subcontractor" Forms[2] were executed by three of the workers, Chad Yother, Mike Jiles, and Carl Combs ("Yother, Jiles, and Combs"), in which they swore they did not want to be covered under the Hartford Policy. However, their employment status as either independent contractors or employees is at issue here, as, after a post-policy audit, Hartford claims the remaining three workers were also employees of Mr. Penney on whose behalf is owed additional premium payment totaling $12,316. The fourth worker has been stipulated to be an employee of Mr. Penney's for whom additional insurance premium payment is due Hartford.

The Hartford Policy at issue contained the following pertinent provisions:

Classifications

Item 4 of the Information Page shows the rate and premium basis for certain businesses or work classifications. These classifications were assigned based on an estimate of the exposures you should have during the policy period. If your actual exposures are not properly described by those classifications, we will assign proper classifications, rates and premium basis by endorsement to this policy.

Remuneration

Premium for each work classification is determined by multiplying a rate times a premium basis. Remuneration is the most common premium basis. This premium basis includes

---

[1]The initial premium charged was $750. No claims were made during the policy period.

[2]These Forms were filed with the Department of Labor ("DOL") on May 11, 2004. However, the record reveals no evidence that the Forms were ever transmitted to Hartford.

payroll and all other remuneration paid or payable during the policy period for the services of:

1. All your officers and employees engaged in work covered by this policy; and

2. All other persons engaged in work that could make us liable under Part One (Workers Compensation Insurance) of this policy. If you do not have payroll records for these persons, the contract price for their services and materials may be used as a premium basis. This paragraph 2 will not apply if you give us proof that the employers of these persons lawfully secured their workers compensation obligations.

A paragraph entitled "Final Premium"[3] provided:

The premium shown on the Information Page, schedules and endorsements is an estimate. The final premium will be determined after this policy ends by using the actual, not the estimated, premium basis and the proper classifications and rates that lawfully apply to the business and work covered by this policy. If the final premium is more than the premium you paid to us, you must pay us the balance . . . .

Under a paragraph entitled "Audit," the policy provided:

You will let us examine and audit all your records that relate to this policy. These records include ledgers, journals, registers, vouchers, contracts, tax reports, payroll and disbursement records, and programs for storing and retrieving data . . . . Information developed by audit will be used to determine final premium. . . .

The Hartford Policy also contained the following notice relating to I-18 Forms:

---

[3]The reason for this provision, which is a standard feature of workers' compensation policies, is that any number of employees may be hired or terminated while the policy is in effect, thus increasing or decreasing the amount of risk to which the insurer is exposed. *CNA v. King*, No. M2004-02911-COA-R3-CV, 2006 WL 2792159, at *7 (Tenn. Ct. App. M.S., Sept. 28, 2006).

If you do not intend for your sole proprietor or partner subcontractors to be eligible for benefits under your policy, you may affirm your intention by filling an I-18 Form(s) with the Division. Please be advised, however, that the I-18 Form is simply a statement of your **intention not to cover** these individuals. It is **not** a form recognized in the Tennessee Workers' Compensation Law and it **does not** resolve the fundamental issue of whether these individuals are working for you as sole proprietors/partners or as employees.

The Tennessee Workers' Compensation Law sets forth seven factors to be considered in **determining whether an individual is an employee or a subcontractor/independent contractor** . . . . These are the factors which we will apply at time of audit to ultimately determine the employment status of your workers, **regardless of whether there are I-18 Forms on file**. Below are the seven factors dictated in the law:

a. The right to control the conduct of the work;
b. The right of termination;
c. The method of payment;
d. The freedom to select and hire helpers;
e. The furnishing of tools and materials;
f. Self-scheduling of working hours;
g. The freedom to offer services to other entities.

Please be prepared to address these factors for each and every alleged sole proprietor/partner subcontractor utilized by your company and ensure that you maintain your records so that it is clear that the individual is truly a subcontractor in accordance with the Tennessee Workers' Compensation Law. Otherwise, these individuals will be deemed to be employees of your company and premium charges will be assessed.

(Emphasis in original).

In June 2004, Hartford sent Mr. Penney a "Supplementary Underwriting Information Request" seeking a variety of items from him to complete its underwriting file, and which Hartford claimed would expedite the post-policy auditing of Mr. Penney's business. Hartford

-4-

also requested that Mr. Penney complete a "Contractor's Questionnaire," but he neither responded to Hartford's initial request for additional information, nor did he return the questionnaire.

A year later, following the expiration of the policy period, Hartford conducted an in-person premium audit of Mr. Penney's business pursuant to the terms of the Hartford Policy. The majority of the content of the audit was undisputed at trial. According to the auditor, Mr. Penney provided the following relevant information to him in the course of the audit: Mr. Penney was "the job site supervisor – 90% of the time on the job, working with the framing crew"; either party had the right to terminate the work; Mr. Penney paid the workers on an hourly wage based on requests they submitted to him; the workers had the right to hire helpers; the workers provided their own tools but Mr. Penney would make available his air tools and air compressor and provide staging if needed; the workers worked "normal construction hours . . . 8–5" and they were "expected to be there" but had "a lot of flexibility given them"; the workers had the freedom to offer their services to others; and the workers did not have or provide evidence of Public Liability Insurance, business licenses and/or profession licenses, business cards, or business listings in the telephone book." For purposes of the audit, the auditor used the wages reflected on 1099 tax forms supplied by Mr. Penney. Based upon this information, the auditor concluded that "[t]he employees submit a bill for the hours worked on an agreed hourly basis. [Penney] has direct control of the job site. I believe they must be considered employees." The auditor did not locate I-18 Forms in the underwriting files.[4] He determined that Mr. Penney owed Hartford an additional $12,316 in premium payment.

On September 25, 2006, Hartford filed suit in General Sessions Court to recover the claimed $12,316 due under the Hartford Policy, plus $105.25 in court costs and $35.00 in service of process fees, for a total of $12,456.25. Mr. Penney counterclaimed, averring the following: Hartford breached its duty of good faith and fair dealing; its actions constituted a deceptive act or practice in violation of the Tennessee Consumer Protection Act; and Mr. Penney had relied upon the representations of the agent who sold him the policy and, therefore, Hartford should be estopped from making any claim against him. Hartford thereafter allowed a default judgment to be granted to Mr. Penney on January 23, 2008, and appealed for a trial de novo in the Circuit Court on February 5, 2008. Subsequently, Mr. Penney voluntarily dismissed his counterclaims and a non-jury trial was held on April 1, 2009. The only witnesses to testify were the auditor and Mr. Penney.

At trial, Mr. Penney testified that the workers "pretty much controlled themselves." He noted that he "didn't hold these guys by the hand and dictate to them what they needed

---

[4]Requirement on the Forms to send "a copy to the general contractor's insurance carrier."

to do." He stressed that he "didn't tell them what to do or when to do it." Mr. Penney stated that contrary to the findings of the auditor, he never let the workers use his tools and he did not indicate that the construction hours were from 8:00 to 5:00. Mr. Penney admitted that he paid the workers by the hour.

In a memorandum and judgment, the trial court held in pertinent part:

[I]f there is "any doubt as to whether the worker is an employee or an independent contractor, the doubt must be resolved in favor of the former." *CNA v. King*, 2006 WL 2792159 (Tenn. Ct. App.) at page 7. The Court believes that the law applicable to claims based upon employee status applies to this case, since that law would determine the liability of the workers' compensation carrier and, thus, liability for the premiums. Although this case is a close one on that issue, the Court believes that the issue must be resolved in favor of Hartford Underwriters Insurance Company. . . .

Judgment was entered in favor of Hartford for $12,316. After Hartford filed a Motion to Alter or Amend seeking pre-judgment interest, the trial court awarded an additional $4,823.77. The total award to Hartford was $17,139.77. Mr. Penney filed a timely appeal.

## II. ISSUES

Mr. Penney raises the following issues on appeal:

1. Whether the trial court erred in determining that workers hired by Mr. Penney were employees and not independent contractors, despite the workers' execution of I-18 Forms to exclude them from coverage under the Hartford Policy and to avoid the assessment of additional workers' compensation insurance premiums?

2. Whether the trial court erred or otherwise abused its discretion in awarding pre-judgment interest to Hartford?

## III. STANDARD OF REVIEW

The trial court's findings of fact are reviewed de novo upon the record with a presumption of correctness. Tenn. R. App. P. 13(d). This court will not disturb the trial court's findings of fact unless the evidence preponderates against them. *Bogan v. Bogan*, 60

S.W.3d 721, 727 (Tenn. 2001). Regarding legal issues, our review is conducted under a de novo standard of review without any deference to the trial court's conclusions of law. *Southern Constructors, Inc. v. Loudon County Bd. of Educ.*, 58 S.W. 3d 706, 710 (Tenn. 2001). Whether or not the workers were independent contractors is a question of law for the trial court rather than a question of fact. *Stratton v. United Inter-Mountain Tel.Co.*, 695 S.W.2d 947, 950 (Tenn. 1985).

The decision to award pre-judgment interest is within the trial court's discretion, and accordingly the standard of review is abuse of discretion or a "manifest and palpable abuse of discretion." *Alexander v. Inman*, 974 S.W. 2d 689, 698 (Tenn. 1998).

# IV. DISCUSSION

## A. EMPLOYMENT STATUS AND PREMIUM LIABILITY

In Tennessee, any inquiry into an individual's employment status for workers' compensation insurance coverage necessarily is guided by overlapping state workers' compensation law. Tennessee workers' compensation law is controlled by statute, intended as a comprehensive scheme to provide "broad coverage for injured workers." *CNA v. King*, No. M2004-02911-COA-R3-CV, 2006 WL 2792159, at *5 (Tenn. Ct. App. M.S., Sept. 28, 2006). Under Tenn. Code Ann. § 50-6-405 (Supp. 2009), employers whose operations fall within the scope of the law are required to maintain a policy of insurance to secure any possible workers' compensation liability or, in the alternative, to meet stringent financial requirements in order to establish and maintain the status of a self-insured employer. The statute further provides that "any person engaged in the construction industry, including principal contractors, intermediate contractors, or subcontractors, shall be required to carry workers' compensation insurance." Tenn. Code Ann. § 50-6-113(f)(1) (2008).

The "existence of an employer-employee relationship has been said to be a primary requirement for employer liability under the Workers Compensation Law." *King*, 2006 WL 2792159, at *4. Once the existence of an employment relationship is established, the employer has the burden of proving the worker was an independent contractor rather than an employee. *Galloway v. Memphis Drum Serv.*, 822 S.W.2d 584, 586 (Tenn. 1991). Any doubt as to whether the worker is an employee or an independent contractor will be resolved in favor of the former. *Armstrong v. Spears*, 393 S.W.2d 729, 731 (Tenn. 1965); *King*, 2006 WL 2792159, at *8.

Tenn. Code Ann. § 50-6-102(11) (2005)[5] sets forth seven primary factors to guide determinations as to whether an individual in a given work relationship is an "employee," or a "subcontractor" or "independent contractor": i) the right to control the conduct of the work; ii) the right of termination; iii) the method of payment; iv) the freedom to select and hire helpers; v) the furnishings of tools and equipment; vi) self scheduling of working hours; and vii) the freedom to offer services to other entities. *See Bargery v. Obion Grain Co.*, 785 S.W.2d 118, 119-20 (Tenn. 1990) (citing *Masiers v. Arrow Transfer & Storage Co.*, 639 S.W.2d 654, 656 (Tenn. 1982)). While no single factor is determinative, the Supreme Court of Tennessee has "repeatedly emphasized the importance of the right to control, the relevant inquiry being whether the right existed, not whether it was exercised."[6] *Galloway*, 822 S.W. 2d at 586 (citing *Stratton v. United Inter-Mountain Tel.*, 695 S.W.2d 947, 950 (Tenn. 1985)); *Carver v. Sparta Elec. Sys.*, 690 S.W.2d 218, 220 (Tenn. 1985)). In this case it is undisputed that Mr. Penney identified himself as the "job site supervisor – 90% of the time on the job," and that he paid the individual workers "based on hourly wage." Additionally, the workers were expected to work according to normal construction hours, and were required to provide a "courtesy call" to Mr. Penney if they were not at work as expected, although he also testified that they "have a lot of flexibility given them" in setting their work schedule. Thus, it appears Mr. Penney was exercising a degree of control inconsistent with an independent contractor relationship, an independent contractor being "one who undertakes to produce a given result without being in any way controlled as to the methods by which he attains that result." *Galloway*, 822 S.W.2d at 587 (internal citation omitted).

Mr. Penney emphasizes the informal nature of the working conditions to downplay the controlling role he exercised over the work performed by the workers. Regarding the actual manner in which work was to be carried out, Mr. Penney notes that they "were experienced and he gave them a set of plans and they took it from there" and that "he did not dictate to them what they needed to do." Notwithstanding the apparent unsophisticated nature of the employment arrangement or the hands-off approach Mr. Penney attempts to portray, the evidence nevertheless suggests Mr. Penney had direct control of the job site, whether or not it was exercised. Such supervisory authority is indicative of the employer-employee hierarchical relationship, albeit an informal one. This conclusion is supported by the *King* court's holding that found a general contractor liable for additional insurance premium assessments for workers who the court found to be statutory employees, despite the contractor-employer "almost never" spending time on the job site while the work was being

---

[5]Now Tenn. Code Ann. § 50-6-102(10)(D) (Supp. 2009).

[6]In addition, the power to terminate has been closely associated with having a "controlling significance" in employment relationships. *Masiers v. Arrow Transfer & Storage Co.*, 639 S.W.2d 654, 656 (Tenn. 1982). It is undisputed that either party had the right to terminate.

performed. *King*, 2006 WL 2792159, at *3. In the words of the court,

> certainly [the general contractor] claimed a remarkable degree of non-involvement with the work for which [he] was getting paid. This court is not inclined to give its imprimatur to such a device as a way of avoiding workers compensation liability because it would be contrary to the purpose of the Workers Compensation Law "to insure as far as possible to all workers payment of benefits when they [are] injured in the course of their employment."

*Id.* at *9.

Arguably, some of the other statutory employment relationship factors support a finding of independent contractor status. Mr. Penney did not withhold any taxes and issued 1099 tax forms. Also, the workers were free to hire their own workers or helpers if they desired, although none did. Additionally, the workers were permitted to offer their services to others during the project even if it would have conflicted with Mr. Penney's project. However, Mr. Penney did not produce invoices demonstrating the alleged independence of the workers. Also, no documentation was produced that the individual workers performed services for any individual or entity other than Mr. Penney. Furthermore, Mr. Penney did not use any workers other than the individuals at issue.

Mr. Penney asserts that the status of Combs, Yother, and Jiles is a close call under the above factors. To tip the scales in his favor, he intimates that the trial court did not give adequate consideration or weight to the DOL's I-18 "Election of Non-Coverage by Subcontractor" Forms in evidence for the workers in its conclusion that they were employees and not independent contractors, at least for insurance premium purposes. While Mr. Penney acknowledges that the mere execution of I-18 Forms alone is not conclusive as to a worker's status, he urges that the timely filing of the Forms at the beginning of the policy period carries additional weight favoring an independent contractor relationship. When combined with the other statutory criteria that weigh in favor of a finding of an independent contractor relationship, Mr. Penney asserts that he has carried his burden of demonstrating that the workers should be excluded from premium consideration.

The workers' compensation law is to be "rationally but liberally construed to promote and adhere to the Act's purposes of securing benefits to those workers who fall within its coverage." *Hodge v. Diamond Container General, Inc.*, 759 S.W.2d 659, 664 (Tenn. 1988). Applying the required liberal construction, we find the preponderance of the evidence establishes that the workers were employees during the policy period.

Contrary to Mr. Penney's assertions regarding the appropriate degree of consideration to be accorded the I-18 Forms, in the very decisions that he has cited as support for his reliance on these Forms, this state's courts have repeatedly limited the evidentiary weight of them toward proving independent contractor status. As the Supreme Court of Tennessee stated in *Warner v. Potts*, although

> the existence of a Form I-18 is not unrelated to the question of whether a worker is an employee or an independent contractor . . . [t]he Form I-18 is not a contract defining the relationship between the parties, but rather it is a notice that an independent contractor has not elected to be covered by workers' compensation. The purpose of the form cannot be to declare the status of the worker as an independent contractor, as one must already be an independent contractor in order to be eligible to use it. Therefore, [an employer] cannot meet his burden of proof by relying on the Form I-18 signed by [a worker]. He must prove that the characteristics of the employment relationship were in fact that of employer and independent contractor . . . To hold otherwise would frustrate the purpose of the workers' compensation system as employers could simply require all their workers to sign a Form I-18 and subsequently claim they were independent contractors, regardless of the actual nature of their relationship to their workers.

No. M2003-02494-SC-WCM-CV, 2005 WL 995236, at *4 (Tenn. Workers Comp. Panel, Apr. 29, 2005).

Similarly, Mr. Penney's reliance on *King* and *Royal Insurance Co. v. R&R Drywall, Inc.,* No. M2002-00791-COA-R3-CV, 2003 WL 21302983 (Tenn. Ct. App. M.S., June 6, 2003), is also misplaced in light of the factual posture and central holdings of those cases relative to the case at bar. The *Royal Insurance* court held that post-policy documentation, including late-executed and filed I-18 Forms, could not be used to avoid retrospective premiums assessed based on an expired policy for "a risk that has now closed." 2003 WL 21302983, at *4. However, the decision was silent on whether and to what extent timely-filed I-18 Forms would be sufficient to avoid such premium liability. *See id.* Moreover, the decision addresses the inadequacy of late-filed devices as a whole, which included I-18 Forms and hand-written partnership agreements, for attempting after-the-fact to avoid liability for risk that had been assumed by the insurer, and gives little indication as to the weight timely executed I-18 Forms alone or the lack thereof would carry towards establishing the employment relationship. *See id.* However, the *Royal Insurance* court did point out the relevant policy concerns reflected in Tenn. Code Ann. § 50-6-114(a), which provides "[n]o contract or agreement, written or implied, or rule, regulation or other device shall in any manner operate to relieve any employer in whole or in part of any obligation created by this

-10-

chapter, except as herein provided." *Id.* Other decisions have applied this language to I-18 Forms themselves, even when timely-filed, to limit their bearing on employment status determinations, both in workers' compensation injury and insurance premium contexts. *See, e.g.*, *King*, 2006 WL 2792159, at *9; *Warner*, 2005 WL 995236, at *4; *Stief v. Madaris Exteriors, Inc.*, No. M2006-01703-WC-R3-WC, 2008 WL 902969, at *3 (Tenn. Workers Comp. Panel, Apr. 2, 2008).

In *King,* a general contractor was assessed additional premiums for roofing subcontractors' helpers who had not executed I-18's. The court in dicta suggested that there were several methods the general contractor could have used to reduce the size of the retrospective premium assessed, such as requiring the workers to obtain their own workers' compensation insurance. 2006 WL 2792159, at *10. The court then mentioned that having all the workers execute I-18's would "strengthen[] the argument that no workers compensation insurance was required of them," which Mr. Penney cites in support of his claim that the trial court failed to accord the I-18s proper consideration in its employment analysis. *Id.* However, based upon the central holding of the *King* decision, even if Mr. Penney's workers had properly executed I-18 Forms, it appears unlikely that they would have been found excluded from the protections of the Hartford Policy. Indeed, the *King* court affirmed the contractor's liability for the additional premium assessments despite the trial court's conclusion that the workers were either independent contractors or statutory employees. *Id.* at *4, 9.

The reason for this apparent contradiction with the workers' compensation liability scheme in which employers are liable only for the injuries of employees and not independent contractors can be explained by the purely contractual principles underlying insurance law that informed the basis of the *King* holding. As the insurance company argued in that case, and the court concluded, if one of the workers had filed a claim after an injury on the job, the insurance company would have been required to defend against the claim and to bear the risk that the worker would be found to be a statutory employee under Tenn. Code Ann. § 50-6-113, and to pay whatever benefits to which the worker was entitled. 2006 WL 2792159, at *7. Specifically, Tenn. Code Ann. § 50-6-113(a) provides "an employer may be held liable for injuries sustained by employees of his subcontractors, even when those subcontractors are deemed to be independent contractors." *Id.* at *4. Thus, the insurance company "assumed the risk to defend any claim brought by an injured worker, even if that defense was to prove the injured worker was an independent contractor." *Id.* at *7. Accordingly, the workers' compensation insurance contract itself and neither the workers' employment relationship nor the execution of an I-18 Form is determinative as to the extent of a contractors' liability for premium assessments by the insurance company.

In the present case, Mr. Penney entered into the Hartford Policy to provide coverage

-11-

over the project period, which, similar to the insurance policy at issue in *King,* provided in part that the "premium basis includes payroll and all other remuneration paid or payable during the policy period for the services of . . . [workers]; and . . . [a]ll other persons engaged in work that **could** make us liable under . . . this policy." (Emphasis added); *see King*, 2006 WL 2792159, at *1. The document further explains that in the absence of payroll records, the contract price for the services and materials furnished by such "other persons" can be used as the premium basis. *Id.* However, this section "will not apply if you give us proof that the employers of these persons lawfully secured their workers' compensation obligations." *Id.* Moreover, the policy contained a notice which specifically provides that an I-18 Form(s) may be filed with the insurance company affirming an insured's intention to exclude subcontractors from the benefits of the policy. However, the notice expressly states that "the insured is to be advised . . . that the I-18 Form is simply a statement of your intention not to cover these individuals. It is not a Form recognized by the Tennessee Workers' Compensation Law and it does not resolve the fundamental issue of whether these individuals are working for you as sole proprietors/partners or as employees."

Applying *King*'s reasoning, regardless of the appropriate evidentiary weight the I-18 Forms merit for employment status purposes, or even of the actual status determination itself, Hartford's potential liability for any injuries during the policy period sustained by Yother, Combs, and Jiles, provides a sufficient basis for enforcing Hartford's additional premium assessments. If any of these workers had been injured on the job, they could have submitted a claim for workers' compensation that Mr. Penney would have had to answer as the arguable employer, irrespective of the executed I-18 Forms. As his insurer, Hartford undertook this risk during the policy period, including the risk that it would have to defend Mr. Penney as the insured in a suit to establish a definitive determination as to the employment relationship between Mr. Penney with the injured worker. The policy language expressly addressing the role of the I-18 Forms only reinforces this conclusion, to the extent Mr. Penney was on notice that filing the I-18s would have limited if any legal effect towards establishing independent contractor status for the workers.

Moreover, while not determinative of the matter, the I-18 Forms subsequent discontinuation[7] during Mr. Penney's policy period with Hartford certainly supports Hartford's position that it had assumed the risk of any injuries suffered by all of Mr. Penney's workers during the policy period. Although the I-18 Form was still in use when Mr. Penney filed the Forms prior to the policy period in May 2004, the fact that in September

---

[7]On September 7, 2004, the use of I-18 Forms was discontinued by the DOL. In a Notice issued regarding the Form's discontinuance, a variety of reasons were given for the discontinuation, including inaccurate reporting abuses specifically designed to avoid larger insurance premiums.

that same year the DOL stopped accepting filings of the I-18 Form due to inaccurate reporting abuses by employers specifically designed to avoid larger insurance premiums, severely limits any legal significance the filing of the I-18s had regarding his premium liability to Hartford.

As Hartford points out, Mr. Penney potentially could have reduced his premium obligation by cooperating with the insurance company, including returning several documents requested by Hartford from him pursuant to the policy that would have expedited the audit where the disputed workers' status and resulting premium assessment was originally made. Instead he failed to provide not only these documents to Hartford, but the I-18 Forms themselves, which was also contrary to policy provisions to which Mr. Penney had agreed when obtaining the coverage. Furthermore, as the *King* court mentioned, Mr. Penney could have reduced the size of the premium or avoided paying a premium for the workers by providing proof that the workers' compensation obligations had already been otherwise lawfully secured either by him or by the workers themselves. *See* 2006 WL 2792159, at *10.

Similarly, Mr. Penney also could have required that the workers carry their own workers' compensation insurance, just as the general contractor over him had required. *See id.* Without Hartford's obligation under the policy to defend at its own expense any claim against Mr. Penney resulting from on the job worker injuries having been sufficiently waived, the Hartford Policy remained exposed to risk related to these individuals for the policy period. Since Mr. Penney failed to comply with the terms of the policy into which he had entered that could have enabled him to avoid or reduce the assessments in the first place, or adequately establish that no workers' compensation insurance was required of the workers during the Hartford Policy period, he remains liable for the premium assessed.

## B. PRE-JUDGMENT INTEREST

Mr. Penney contends that the trial court abused its discretion in awarding Hartford pre-judgment interest. Tenn. Code Ann. § 47-14-123 provides that "[p]re-judgment interest . . . may be awarded by courts or juries in accordance with the principles of equity at any rate not in excess of a maximum effective rate of ten percent (10%) per annum . . . ." In addition, it has been determined that "an award of pre-judgment interest is within the sound discretion of the trial court and the decision will not be disturbed by an appellate court unless the record reveals a manifest and palpable abuse of discretion." *Myint v. Allstate Ins. Co.*, 970 S.W.2d 920, 927 (Tenn. 1998)(citations omitted); *Alexander v. Inman*, 974 S.W.2d 689, 698 (Tenn. 1998).

The purpose of pre-judgment interest is not to penalize a defendant for wrongdoing,

but to fully compensate a plaintiff for the loss of the use of funds to which he or she was legally entitled. *Hunter v. Ura*, 163 S.W.3d 686, 706 (Tenn. 2005). "The trial court must consider whether the amount of the obligation was certain or ascertainable and whether the existence of the obligation was disputed on reasonable grounds." *Hunter*, 163 S.W.3d at 706. These are only two of the factors to be considered when deciding whether prejudgment interest is, as a matter of law, equitable under the circumstances. *Id.* "The uncertainty of either the existence or amount of an obligation does not mandate a denial of prejudgment interest[.]" *In re Estate of Ladd*, 247 S.W.3d 628, 645 (Tenn. Ct. App. 2007) (citing Tenn. Code Ann. § 47-14-123). Essentially, the trial court must decide whether awarding prejudgment interest is fair, given the circumstances of the case. *Id.*

However, as Mr. Penney argues, under *Collins v CMH Mfg.,* remand is appropriate "when the record is silent as to the reasons the trial judge awarded pre-judgment interest," because "the appellate court is unable to determine if the award is justified or whether the trial judge abused its discretion." No. E1999-01225-WC-R3-CV, 2000 WL 1887534 at *4 (Tenn. Workers Comp. Panel, Dec. 28, 2000). As the trial court stated, this was a "close case" on the issue of liability, just as the issue of liability in *Collins* had been "strongly and legitimately questioned." *Id.* Furthermore, as in *Collins* where the trial judge had taken the case under advisement for a period of seventeen months before entering a judgment on the workers' compensation claim, *id.*, in the case at bar the trial judge in the initial action in General Sessions Court took around sixteen months to render a default judgment after the initial filing of the suit. In addition, the plaintiff's appeal in the circuit court took nearly another 15 months to reach judgment. Accordingly, since the record is silent on the reasons for the award, we are unable to say whether the award is justified and therefore remand the issue of the award of pre-judgment interest to the trial court for a statement of fact.

## V. CONCLUSION

We affirm the judgment of the trial court on the finding of the amount of compensation for the retrospective premium assessment by Hartford and remand on the issue of prejudgment interest. Costs on appeal are taxed to the appellant, Dale Penney, d/b/a DLP Construction Company.

_____
JOHN W. McCLARTY, JUDGE

-14-