IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
March 6, 2012 Session

# AMERICAN ZURICH INSURANCE COMPANY

v.

# MVT SERVICES, INC., D/B/A MESILLA VALLEY TRANSPORTATION

**An Appeal from the Chancery Court for Davidson County**
**No. 08-6161     Claudia Bonnyman, Chancellor**

_____

**No. M2011-01266-COA-R3-CV - Filed July 27, 2012**

_____

This appeal involves retrospective insurance premiums on a workers' compensation insurance policy. The defendant trucking company operates in several states, including Texas and Tennessee. Tennessee requires employers to maintain worker's compensation insurance for certain employees, but Texas does not. The defendant trucking company purchased workers' compensation insurance for its Tennessee employees from the plaintiff insurance company. The trucking company employed over-the-road truck drivers who were Tennessee residents. The trucking company decided to classify its Tennessee-resident over-the-road drivers as Texas employees whose on-the-job injuries would not be covered by the Tennessee workers' compensation insurance policy. Consequently, the trucking company did not pay insurance premiums to cover those employees. The plaintiff insurance company conducted a retrospective premium audit; in the audit, it determined that the Tennessee-resident over-the-road drivers presented a risk of loss to the insurance company. Consequently, the insurance company notified the trucking company that it owed retrospective premiums based on those drivers. The trucking company refused to pay, so the insurance company canceled the insurance policy and filed this lawsuit for the retrospective premiums. The trial court granted summary judgment in favor of the insurance company, and the trucking company now appeals. We affirm, finding under the undisputed facts that the Tennessee-resident over-the-road employees presented a risk of loss to the insurer under the workers' compensation insurance policy during the relevant policy periods.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court is Affirmed**

HOLLY M. KIRBY, J., delivered the Opinion of the Court, in which DAVID R. FARMER, J., and J. STEVEN STAFFORD, J., joined.

Donald Capparella and Candi Henry, Nashville, Tennessee, for the Defendant/Appellant MVT Services, Inc., d/b/a Mesilla Valley Transportation[1]

Ben M. Rose and J. Matthew Blackburn, Nashville, Tennessee, for the Plaintiff/Appellee American Zurich Insurance Company

## OPINION

### FACTS AND PROCEEDINGS BELOW

Defendant/Appellant MVT Services, Inc., d/b/a Mesilla Valley Transportation ("MVT"), is a large trucking company. Created in 1981, MVT provides transportation services over a broad geographical area in the United States, Mexico, and Canada. MVT's corporate headquarters is in Las Cruces, New Mexico, and its main transportation terminal is located in El Paso, Texas. In 2003, MVT expanded its operations to Middle Tennessee.[2]

During the relevant time period, MVT's Tennessee business location was on a six-acre tract on Centennial Boulevard in Nashville, Tennessee.[3] MVT employs several different types of workers in Tennessee, including clerical workers, a fleet manager, mechanics, and drivers. The drivers who live in Tennessee are characterized as either "local" drivers or "over-the-road" drivers. Local drivers pick up and haul loads only within Tennessee; over-the-road drivers handle long distance hauls across state lines and travel for extended periods of time. Evidence in the record suggests that, during the relevant time period, MVT's Tennessee business employed as many as 143 over-the-road drivers who resided in Tennessee. In this Opinion, we refer to these drivers as "Tennessee-resident over-the-road drivers."

### The American Zurich Insurance Policy

Tennessee's Workers' Compensation Act requires MVT to maintain workers' compensation insurance for its Tennessee employees or, alternatively, to meet Tennessee's self-insurance

---

[1]Counsel for MVT Services, Inc., d/b/a Mesilla Valley Transportation, in this appeal did not represent this party in the trial court below.

[2]MVT's expansion into Tennessee was based in large part on its contractual obligation to make deliveries for customer A.O. Smith, a large residential and commercial water heater manufacturer.

[3]MVT has since moved to a larger location in Nashville.

requirements. Tenn. Code Ann. § 50-6-405.[4] For this reason, in March 2004, MVT purchased a workers' compensation insurance policy ("Zurich Policy") from Plaintiff/Appellee American Zurich Insurance Company ("Zurich Insurance") for its Tennessee employees.[5]

The Zurich Policy was a standard assigned risk policy, procured by MVT through the Tennessee Worker's Compensation Insurance Plan.[6] Tennessee's assigned risk program is administered by the National Council for Compensation Insurance ("NCCI"), a rating organization that makes rules, classifications, and rating plans for workers' compensation insurance.[7] ***See CNA (Continental Cas.) v. King***, No. M2004-02911-COA-R3-CV, 2006 WL 2792159, at *1 (Tenn. Ct. App. Sept. 28, 2006); ***Travelers Indem. Co. v. Int'l Nutrition, Inc.***, 734 N.W.2d 719, 722 (Neb. 2007).

The Zurich Policy expressly provided that MVT's insurance premium would be calculated by the use of "retrospective rating." This method of insurance premium calculation bases the premium on the total payroll of covered employees during the policy period. It is typically used where the exact composition of the employer's workforce is subject to substantial variation, or where the insured's risk is difficult to measure at the beginning of the policy period. ***See*** Lee R. Russ & Thomas F. Segalla, 5 *Couch on Ins. 3d* § 69:15 (2008). Under the retrospective rating method, the employer deposits an estimated premium with the

---

[4]Generally, the Tennessee Workers' Compensation Law, Tennessee Code Annotated § 50-6-101 *et seq.* ("Workers' Compensation Law"), requires all employers with five or more employees, with certain exceptions, to provide workers' compensation coverage for their employees. Tenn. Code Ann. § 50-6-106(5); *see CNA (Continental Cas.) v. King*, No. M2004-02911-COA-R3-CV, 2006 WL 2792159, at *4 (Tenn. Ct. App. Sept. 28, 2006); ***Jo Ann Forman, Inc. v. Nat'l Council on Comp. Ins., Inc.***, 13 S.W.3d 365, 366 (Tenn. Ct. App. 1999).

[5]The Zurich Policy was renewed, cancelled, and reinstated on various occasions. At all times relevant to this lawsuit, however, Zurich Insurance provided workers' compensation coverage to MVT effectively under the same policy. The primary policy involved in this lawsuit is Policy Number 6ZZUB-7929B37-0.

[6]Employers are permitted to purchase workers' compensation insurance in either the voluntary market or the residual (assigned risk) market. An assigned risk plan is insurance approved by the Commissioner of Commerce and Insurance as insurance "of last resort," available when an employer is unable to obtain coverage in the voluntary market. ***See Jo Ann Forman***, 13 S.W.3d at 366 (citing Tenn. Code Ann. § 56-5-314(c) (Supp. 1998)).

[7]The NCCI gathers data on a nationwide basis and creates tables reflecting the loss experience in each state for each type of employment. ***See State ex rel. Flowers v. Tenn. Trucking Ass'n Self Ins. Group Trust***, 209 S.W.3d 595, 597-98 n.6 (Tenn. Ct. App. 2006).

insurance company at the beginning of the policy period.[8]  Shortly after the policy period expires, the insurance company conducts a routine retrospective premium audit, looking back at the workers who were actually on the insured's payroll during the policy period, utilizing records provided by the insured employer related to employee payroll and classification.  The actual insurance premium due for the immediate past policy period is then determined based on the results of the audit.  Depending on the audit result, the insured employer may either receive a refund on the premium paid or be required to pay additional premiums to the insurance company.

The Zurich Policy outlines the retrospective rating methodology to be used to calculate MVT's insurance premium:

> **C.  Remuneration**
> Premium for each work classification is determined by multiplying a rate times a premium basis.  Remuneration is the most common premium basis.  *This premium basis includes payroll* and all other remuneration paid or payable during the policy period *for the services of*:
>
> > 1.  All your officers and employees engaged in work covered by this policy; and
> >
> > 2.  *All other persons engaged in work that could make us liable under Part One (Workers Compensation Insurance) of this policy*.  If you do not have payroll records for these persons, the contract price for their services and materials may be used as the premium basis.  This paragraph 2 will not apply if you give us proof that the employers of these persons lawfully secured their workers compensation obligations.
>
> . . .
>
> **E.  Final Premium**
> The premium shown on the Information Page, schedules, and endorsements is an estimate.  *The final premium will be determined after this policy ends by using the actual, not the estimated, premium basis and the proper classifications and rates that lawfully apply to the business and work covered by this policy.*  If the final premium is more than the premium you paid to us,

---

[8]The estimate is determined by the insured, and the insured submits the estimate to the insurance company for approval based on estimated payroll amounts and classification codes.

you must pay us the balance.  If it is less, we will refund the balance to you. . . .

**F.  Records**
You will keep records of information needed to compute premium.  You will provide us with copies of those records when we ask for them.

**G.  Audit**
*You will let us examine and audit all your records that relate to this policy.* These records include ledgers, journals, registers, vouchers, contracts, tax reports, payroll an disbursement records, and programs for storing and retrieving data. . . . *Information developed by audit will be used to determine final premium.*  Insurance rate service organizations have the same rights we have under this provision.

(Emphasis added.)  Thus, the Zurich Policy obligated MVT to produce to Zurich Insurance payroll records and any other records for work that was completed during the policy period for all of its employees and subcontractors for use in the insurance company's retrospective premium audit.  Paragraph E of the Zurich Policy indicated that the results of the audit would dictate whether MVT received a refund or was charged additional premiums.  MVT was required under the policy to pay insurance premiums for all employees and workers who may have placed Zurich Insurance at risk of loss during the audited policy period.

### The Texas Occupational Benefit Plan

In 2004, MVT maintained the Zurich Policy for its Tennessee employees, but created an alternative arrangement for its Texas employees, described as an Occupational Benefit Plan ("OB Plan").  The State of Texas has a system of workers' compensation, but in contrast to Tennessee, employers in Texas are not required to maintain workers' compensation insurance for Texas employees.  MVT chose not to have workers' compensation insurance under the Texas workers' compensation system for its Texas employees.  Instead, MVT created the OB Plan as a company-sponsored means for the Texas employees to recover for any on-the-job injuries they sustained.  MVT's OB Plan was less expensive to MVT than workers' compensation insurance.[9]

---

[9]For purposes of this appeal, it is undisputed that MVT's OB Plan does not qualify as a substitute for bona fide workers' compensation insurance under Tennessee law.  For example, the OB Plan does not pay medical benefits once the employee reaches maximum medical improvement; Tennessee's Workers' Compensation laws require such benefits.  ***See*** Tenn. Code Ann. §§ 50-6-204, 207, and 209; ***see also*** Tenn. Code Ann. §
(continued...)

After MVT established its OB Plan, it did not pay premiums to Zurich Insurance for its Tennessee-resident over-the-road drivers, taking the position that those employees were actually Texas employees who were covered under the Texas OB Plan.[10] MVT classified the Tennessee-resident over-the-road drivers as Texas employees because they were hired from MVT's Texas office, their paychecks were generated from Texas, their assignments came from Texas, their job required them to travel in several states, and they attended MVT orientation in MVT's main terminal in El Paso, Texas. At orientation, the Tennessee-resident drivers were informed that they were not covered by the Zurich Policy for their on-the-job injuries, but instead were considered Texas employees covered by the OB Plan. Consistent with MVT's classification, MVT reported those Tennessee-resident drivers to the state of Texas, not to Tennessee, for purposes of unemployment insurance filings.

When MVT made the decision to classify the Tennessee-resident over-the-road drivers as Texas employees and cease making premium payments for the drivers, it sent a notification letter to Zurich Insurance.[11] MVT's letter explained that MVT did not need workers' compensation insurance coverage for the Tennessee-resident over-the-road drivers, and that it would no longer submit insurance claims for them under the Zurich Policy. Zurich Insurance did not respond to MVT's notification letter.

### Retrospective Premium Audits

#### *Events Leading to Relevant Audits*

During the policy period beginning March 16, 2004, through March 16, 2005, about twenty of MVT's Tennessee-resident over-the-road drivers filed claims for on-the-job injuries under the Zurich Policy. Zurich Insurance paid some of these claims.

In May 2005, after the policy period ended, Zurich Insurance conducted a retrospective premium audit for that policy period. In the audit, Zurich Insurance discovered that MVT had not paid workers' compensation insurance premiums for the twenty workers who had filed claims. The account manager underwriter responsible for the insurance policy audits

---

[9](...continued)
50-6-114(a) ("No contract or agreement . . . shall in any manner operate to relieve any employer, in whole or in part, of any obligation created by this chapter, except as provided [herein].").

[10]It is unclear from this record whether, or to what extent, MVT ever paid insurance premiums to Zurich Insurance for the Tennessee-resident over-the-road drivers before it established the OB Plan.

[11]This letter is not in the appellate record. We will assume for purposes of this appeal, however, that the letter was sent as asserted by MVT.

of MVT, Ms. Latoya Pierce ("Ms. Pierce"),[12] later explained: "When it came time for the [MVT] audit, none of the individuals could be found. The payroll records could not be found for those claimants that were submitted under our policy." Thus, MVT had not included those employees in the initial calculation of its insurance premium. Upon learning this, Ms. Pierce decided that no further claims filed by MVT's Tennessee-resident over-the-road drivers would be covered under the Zurich Policy. On July 8, 2005, Ms. Pierce wrote an internal memorandum informing a coworker that MVT "has stated that the reason we could not find the payroll for the 20 claimants during last year's policy . . . is because they were all hired out of Texas – the over the road drivers are not Tennessee employees." Based on this, Ms. Pierce told the co-worker: "Going forward, we will not accept any claims for these individuals nor should we be picking up any payroll at audit that does not originate from the state of Tennessee." Ms. Pierce's memorandum was only distributed internally and was not communicated to MVT.

Nevertheless, even after she decided that Zurich Insurance should not accept further claims for MVT's Tennessee-resident over-the-road drivers, Ms. Pierce remained uncertain about Zurich Insurance's risk exposure under the Zurich Policy for these employees. She realized that, for Zurich Insurance to have accepted the claims, the Tennessee-resident over-the-road drivers who had filed claims under the Zurich Policy must have told Zurich Insurance representatives that they "were principally employed in the state of Tennessee," because all of the claimants' injuries had occurred outside of Tennessee. Reviewing the records that MVT had provided to Zurich Insurance, Ms. Pierce saw that MVT had locations in several states, and she was unsure about where the Tennessee-resident over-the-road drivers lived and whether they should have been classified as Tennessee employees for purposes of coverage. As a result, "to nail down" Zurich Insurance's exposure, Ms. Pierce arranged for an underwriting review process in which MVT's account would be reviewed by several underwriters, a process done when there is a particular concern.

In 2005, three audits of MVT were conducted by outside audit firms, sometimes called "fee companies." The audits concluded that MVT's payroll for the Tennessee-resident over-the-road drivers should have been included in MVT's premium calculation, but gave few details about the basis for the conclusion. Dissatisfied with these audits, Ms. Pierce requested an internal audit. Zurich Insurance's audit department then contacted its own auditor, Harvey

---

[12]Ms. Pierce is actually an employee of Travelers Insurance. In the record, the relationship between Travelers Insurance and Zurich Insurance is unclear; however, it is undisputed that Ms. Pierce, as a Travelers Insurance employee, administered the Zurich Policy per a contract between Travelers Insurance and Zurich Insurance.

Lehrfeld ("Mr. Lehrfeld"),[13] for a thorough re-audit of MVT's operations, with particular emphasis on the Tennessee-resident over-the-road drivers.

As requested, Mr. Lehrfeld conducted the re-audit of MVT, focusing on the policy period of March 29, 2005, through May 10, 2005. After his audit, in a January 2006 email to Ms. Pierce, Mr. Lehrfeld commented that "the difference between the audit by the fee compan[ies] [(outside audit firms)] and my audit is the gray area of over-the-road drivers." In his preliminary conclusions, Mr. Lehrfeld chose not to include the payroll of the Tennessee-resident over-the-road drivers in his calculation of MVT's premium, because the information given to him by MVT indicated that these drivers were Texas employees. At the same time, however, he noted specifically that no driving logs had been made available to him. In her response to Mr. Lehrfeld, Ms. Pierce said:

> Because [MVT] did not provide the driving logs, you were unable to definitely determine the state of each driver's base terminal for regular loading, unloading, etc. or the state in which they spend a majority of their driving time, therefore please process the audit to include all drivers based on their state of residence according to the NCCI's extra-territorial classification guidelines . . . .

Thus, Ms. Pierce asked Mr. Lehrfeld to process the information MVT had provided in accordance with the guidelines promulgated by NCCI, the national rating organization that administers Tennessee's assigned risk program.

The NCCI guidelines referenced by Ms. Pierce were contained in the NCCI Scopes Manual ("NCCI Scopes Manual") guidelines on so-called "extra-territorial" drivers. Those guidelines provide:

> The payroll of drivers, chauffeurs, and helpers for truckers shall be assigned to the state in which the base terminal from which they load, unload, store or transfer freight on a regular basis is located. . . . When the driver, chauffeur or helper does not operate from a base terminal, a determination shall be made as to where the exposure lies. In that case, payroll shall be assigned as follows:
>
> > 1. If it can be established that a trucker spends a majority of driving time in a specific state, the trucker's payroll shall be assigned to that state.

---

[13]Mr. Lehrfeld is also employed by Travelers Insurance, and at that time he had been an auditor for 38 years.

> 2. *If a base terminal or state of majority of driving time cannot be established and a trucker is traveling from his state of residence, payroll shall be assigned to the trucker's state of residence.*

(Emphasis added). Therefore, under these NCCI guidelines, in the absence of information from MVT about the drivers' base terminal or the location where the drivers spent the majority of their driving time, Ms. Pierce determined that those employees should be assigned to their state of residence – Tennessee.

In a follow-up email, Mr. Lehrfeld asked Ms. Pierce to make the decision about whether to include MVT's Tennessee-resident over-the-road drivers in the final premium calculations. Ms. Pierce responded that, "*absent the driving logs*, these individuals are being included based on the [NCCI] extra-territorial classification guidelines for class code 7219."[14] (Emphasis in original).

### *Policy Period 1*

The next month, Ms. Pierce asked Mr. Lehrfeld to conduct another audit of MVT for a different policy period. This audit was to be a complete retrospective premium audit for the first policy period in question in this lawsuit, namely, the period of June 30, 2005, through March 16, 2006 ("Policy Period 1"). To conduct this audit, Mr. Lehrfeld met with MVT's vice president of administration and human resources, Luis Garcia, at MVT's headquarters in Las Cruces, New Mexico. The purpose of Mr. Lehrfeld's meeting was to obtain information about the MVT Tennessee-resident drivers. Mr. Lehrfeld asked Mr. Garcia for employment records and driving logs for the Tennessee-resident over-the-road drivers in order to determine where they spent the majority of their time and where the majority of their loads originated. Mr. Garcia told him that the driving logs were not available because they were maintained at an off-site location. Mr. Garcia explained that MVT treated all of those drivers, as a group, as Texas employees and covered them under the MVT's OB Plan, not the Zurich Policy.

Without the driving logs or other documentation to show the base terminal for MVT's Tennessee-resident over-the-road drivers or where they spent the majority of their driving time, Mr. Lehrfeld again turned for guidance to the NCCI Scopes Manual. Based on the NCCI guidelines, Mr. Lehrfeld assigned the payrolls for those drivers to the state of the drivers' residence, Tennessee. Pursuant to the NCCI guidelines, Mr. Lehrfeld calculated that

---

[14]It is not clear whether MVT was charged with retrospective premiums on the Tennessee-resident over-the-road drivers for that policy period as a result of this audit.

MVT owed Zurich Insurance a retrospective premium balance of $231,534 for Policy Period 1.

MVT refused to pay the retrospective premium balance assessed against it for Policy Period 1. As a result, Zurich Insurance canceled MVT's insurance policy on June 3, 2006.

### *Policy Period 2*

After canceling MVT's workers' compensation insurance coverage, Zurich Insurance directed Mr. Lehrfeld to conduct a cancellation audit for the time period immediately preceding cancellation. This time period is the second policy period involved in this lawsuit, March 17, 2006, through the cancellation date, June 3, 2006 ("Policy Period 2").[15] To accomplish this, on July 13, 2006, Mr. Lehrfeld again met with Mr. Garcia at MVT headquarters in Las Cruces, New Mexico, to discuss the Tennessee-resident over-the-road drivers, with the same result. Not surprisingly, Mr. Lehrfeld reached the same conclusion that, absent the driving logs, the payrolls of all of MVT's Tennessee-resident over-the-road drivers must be included for purposes of calculating MVT's workers' compensation insurance premium. As a result, Mr. Lehrfeld determined that MVT owed Zurich Insurance another $96,807 in retrospective premiums for Policy Period 2. MVT again declined to pay the assessed premium. This left unpaid a total of $328,341 in retrospective premiums for both policy periods.

### Lawsuit

On March 13, 2008, Zurich Insurance filed this lawsuit against MVT in the Chancery Court for Davidson County, Tennessee. Under the terms of the Zurich Policy, Zurich Insurance sought $328,341 in retrospective premiums due from MVT for Policy Periods 1 and 2, plus prejudgment interest.

In its answer, MVT denied liability for the retrospective premiums. As an affirmative defense, MVT claimed that Zurich Insurance should be estopped from asserting that an agreement existed to cover the Tennessee-resident over-the-road drivers, because it knew or should have known that it was providing coverage only for MVT's Tennessee administrative and clerical staff, not its drivers. In addition, MVT asserted a counterclaim against Zurich Insurance. The counterclaim alleged that, during the two policy periods at issue, twelve of MVT's Tennessee-resident over-the-road drivers submitted claims to MVT for their on-the-job injuries through MVT's OB Plan. MVT argued that, if it were held liable for extra

---

[15]Policy Period 2 would have expired on March 16, 2007, but it ended prematurely when the Zurich Policy was canceled due to non-payment of the retrospective insurance premium for Policy Period 1.

retrospective premiums on the Zurich Policy, then the twelve claims filed by those drivers under MVT's OB Plan should have been covered by Zurich Insurance under the Zurich Policy.

After discovery, Zurich Insurance filed a motion for partial summary judgment with regard to MVT's counterclaim. Because it was undisputed that MVT did not report to Zurich Insurance any on-the-job injuries for the twelve subject Tennessee-resident drivers or otherwise present the claims for payment, Zurich Insurance argued, it was impossible for Zurich Insurance to perform under the insurance contract. Therefore, Zurich Insurance contended, it was undisputed that it did not breach the Zurich Policy. In support of this motion, Zurich Insurance attached a statement of undisputed facts, MVT's responses to interrogatories, MVT's answers to requests for admissions, and a copy of the Zurich Policy. MVT's response argued that genuine issues of material fact remained on its counterclaim.

Zurich Insurance then filed a second motion for summary judgment, this one on the allegations in its complaint in chief. The second summary judgment motion claimed that the undisputed facts established that MVT was responsible under the Zurich Policy for paying workers' compensation insurance premiums for its Tennessee-resident over-the-road drivers, because those employees presented a risk of loss to Zurich Insurance under the insurance policy. In support of its motion, Zurich Insurance attached another statement of undisputed facts, the Zurich Policy, the NCCI Scopes Manual Extra-Territorial Provision, and four depositions.[16]

MVT's response to Zurich Insurance's second motion for summary judgment argued that this motion should be denied also because there were genuine issues of material fact for trial. MVT asserted that it had legitimately classified its Tennessee-resident over-the-road drivers as Texas employees during the relevant policy periods. MVT also said that the depositions of Mr. Lehrfeld and Ms. Pierce showed that several factors are considered in determining the state of payroll for a given driver, including the state in which the driver is hired, the state of origin of the driver's paycheck, the state in which the driver spends the majority of his time, and the state in which the driver begins his runs. MVT also argued that it was unclear whether the NCCI guidelines applied in this situation. Even if the NCCI guidelines were applicable, MVT argued, there was a genuine issue of material fact as to the state of payroll for each Tennessee-resident over-the-road driver employed by MVT during the policy period when considered individually, because each employee's circumstances were unique.

---

[16]Zurich Insurance also attached to the motion a copy of an order of the Tennessee Department of Labor and Workforce Development approving a settlement between the Uninsured Employers Fund and MVT related to time periods other than those involved in the lawsuit.

**Trial Court's Decision**

On February 25, 2011, the trial court conducted a hearing on both of Zurich Insurance's motions for summary judgment. At the conclusion of the hearing, the trial court held in favor of Zurich Insurance on both motions.

The trial court first discussed the summary judgment motion on Zurich Insurance's complaint. Initially, the trial court held that the payrolls of MVT's Tennessee-resident over-the-road drivers should have been included in calculating MVT's insurance premium under the Zurich Policy. Applying the guidelines set out in the NCCI Scopes Manual to the undisputed facts, the trial court concluded that the payrolls of all of the Tennessee-resident over-the-road drivers would be included in MVT's premium basis:

> [T]he Tennessee resident over-the-road drivers engaged in work for [which] MVT could make Zurich liable under the policy pursuant to the NCCI manual rules.
>    [MVT] does not dispute that the Tennessee resident over-the-road drivers loaded, unloaded at the Tennessee terminal during the policy period and drove out from the Tennessee terminal. The payroll for these resident – Tennessee resident over-the-road drivers are specifically to be included in the calculation in the premium basis under the NCCI manual rules.

Thus, the trial court granted summary judgment to Zurich Insurance on the claims in its complaint.

The trial court also granted summary judgment in favor of Zurich Insurance on MVT's counterclaim, because it was undisputed that MVT did not report any claims to Zurich Insurance as required under the policy. Therefore, it held, Zurich Insurance had no obligation to cover the claims.

On March 17, 2011, the trial court entered a written order on the motions for summary judgment filed by Zurich Insurance. The order incorporated by reference the trial court's oral ruling, and it expanded on the ruling as well. The order explained that, "as the Zurich Policy is an assigned risk policy, the NCCI manual governs the premium determination at issue," and it quoted pertinent excerpts from the NCCI guidelines. The trial court recited several undisputed facts supporting its conclusion that MVT's Tennessee-resident over-the-road drivers should have been included in the calculation of its retrospective premium:

> [A]t all times relevant to this dispute, MVT maintained a terminal [in] Nashville, Tennessee ("Tennessee Terminal"). MVT['s] . . . Tennessee

-12-

resident over-the-road drivers loaded and unloaded at the Tennessee Terminal
. . . . [T]hese drivers began and ended their trips on a regular basis at the
Tennessee Terminal.

\* \* \*

[T]he over the road drivers were managed by dispatchers who were located in
Tennessee. . . . Dispatchers were responsible for making sure trip plans are
implemented and drivers return to Tennessee, as scheduled. With the
exception of information uploaded to the driver's on board computer, all
communications between MVT and these drivers were accomplished through
the Tennessee dispatchers. Such communications included the reporting of
any on the job injuries. . . . The Tennessee Terminal was the only MVT
facility with which the Tennessee drivers visited and communicated on a
regular basis.

. . . All applications, interviews, background checks, and driving tests for
MVT's Tennessee over the road drivers took place in Tennessee.

Considering these undisputed facts, the order concluded that Zurich Insurance was exposed
to risk during the policy periods at issue by MVT's employment of the Tennessee-resident
over-the-road drivers, and that Zurich Insurance correctly calculated MVT's retrospective
premiums under the Zurich Policy by including the payrolls of these drivers. Finally, the
order granted Zurich Insurance summary judgment on MVT's counterclaim.

On April 27, 2011, the trial court entered an agreed final order awarding Zurich Insurance
prejudgment interest in the amount of $99,260.50 and assessing costs against MVT. MVT
now appeals.

### ISSUES ON APPEAL AND STANDARD OF REVIEW

MVT states the issue on appeal as follows:

Whether the trial court erred in granting a summary judgment declaring
that retrospective premiums were owed on a workers' compensation policy for
Tennessee resident employees when (1) the guidelines that the court deemed
governing are optional and by their own terms do not apply under the facts of
this case, (2) there is no material evidence as to where any individual employee
was hired or principally worked, (3) evidence regarding general company
policies with respect to the location of hiring and supervision is conflicting,
and (4) the insured had notified the insurance company of its request to decline

-13-

coverage for the class of workers at issue and utilize an occupational injury benefit plan?[17]

The resolution of a motion for summary judgment is a matter of law, which we review *de novo*, with no presumption of correctness in the trial court's decision. **Martin v. Norfolk S. Ry. Co.**, 271 S.W.3d 76, 84 (Tenn. 2008). In addressing this issue, "we are required to review the evidence in the light most favorable to the nonmoving party and to draw all reasonable inferences favoring the nonmoving party." **Id.** (citing **Staples v. CBL Assocs., Inc.**, 15 S.W.3d 83, 89 (Tenn. 2000)).

A motion for summary judgment should be granted only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Tenn. R. Civ. P. 56.04. In filing a motion for summary judgment, the initial task of the party bearing the ultimate burden at trial is to "produce evidence for all unadmitted elements of the claim or defense, and the evidence must be such that, if uncontradicted, no reasonable jury could find against the movant and the movant would be entitled to a directed verdict at trial." Robert Banks Jr. & June F. Entman, *Tennessee Civil Procedure* § 9-4(m) (3d ed. 2009) (emphasis added); *see Milan Box Corp. v. Hardy*, No. W2006-02478-COA-R3-CV, 2007 WL 2790680, at *8-9 (Tenn. Ct. App. Sept. 26, 2007). Thus, a plaintiff-movant cannot be granted summary judgment unless it "establishes both the elements of his claim and the invalidity of all asserted defenses." **Milan Box Corp.**, 2007 WL 2790680, at *9 (citing *Tennessee Civil Procedure, supra,* § 9-4(m)); *see Heatherly v. Campbell Co. Sch. Bd.*, No. 03A01-9505-CH-00155, 1995 WL 491002, at *2 (Tenn. Ct. App. Aug. 18, 1995).

The interpretation of a contract is a question of law, subject to *de novo* review, with no presumption of correctness in the trial court's conclusion. **Allstate Ins. Co. v. Tarrant**, 363 S.W.3d 508, 527 (Tenn. Ct. App. 2012). Likewise, the interpretation of a statute is an issue of law subject to *de novo* review. **Nye v. Bayer Cropscience, Inc.**, 347 S.W.3d 686, 694 (Tenn. 2011).

## ANALYSIS

On appeal, MVT's primary argument is that the employment status of the disputed Tennessee-resident over-the-road drivers must be determined on a case-by-case basis for

---

[17]In the argument section of MVT's appellate brief, the issues are framed somewhat differently from the Statement of the Issue in the brief. Ultimately the difference is not material to our analysis. MVT does not appeal the trial court's grant of summary judgment on MVT's counterclaim.

each driver, because the circumstances for each are different. Only after that is done, MVT argues, may the court determine if Zurich Insurance correctly calculated the retrospective workers' compensation insurance premium owed by MVT, if any. Because Zurich Insurance has not presented undisputed evidence as to individual drivers, MVT contends, issues of material fact remain, and Zurich is not entitled to summary judgment. MVT also insists that the trial court erred in relying on the NCCI guidelines, because they are only guidelines and are not applicable here because Zurich Insurance had its own guidelines.

In response, Zurich Insurance insists that MVT never argued to the trial court that the employment status of the disputed drivers must be ascertained on a case-by-case basis for each individual driver, and so MVT is precluded from making this argument on appeal. It contends that, for insurance policies that provide for retrospective premiums, the burden is on the insured to establish that an employee should be excluded from the premium calculation. Zurich Insurance emphasizes that the Zurich Policy covered employees who presented an arguable workers' compensation risk, so Zurich Insurance correctly calculated MVT's retrospective premium on that basis. It maintains that reference to the NCCI guidelines was appropriate under the Zurich Policy.

At heart, this is a contractual dispute in which we are called upon to interpret each party's obligation under the Zurich Policy. Insurance policies are contracts subject to the traditional rules of contractual interpretation. *See King*, 2006 WL 2792159, at *5. The "cardinal rule" of contract interpretation is to ascertain the intent of the parties and to effectuate that intent consistent with applicable legal principles. *Frizzell Constr. Co. v. Gatlinburg, L.L.C.*, 9 S.W.3d 79, 85 (Tenn. 1999). When interpreting a contract, our role is to ascertain the intention of the parties "based on the ordinary meaning of the language contained within the four corners of the contract." *84 Lumber Co. v. Smith*, 356 S.W.3d 380, 383 (Tenn. 2011). If the language is unambiguous, the contract must be interpreted as written, and the words expressing the parties' intentions should be given the usual, natural, and ordinary meaning. *Pitt v. Tyree Org.*, 90 S.W.3d 244, 252 (Tenn. Ct. App. 2002).

Because the Zurich Policy is a contract for workers' compensation insurance, we must interpret the policy in a manner that is consonant with Tennessee's workers' compensation laws. Consequently, a brief overview of Tennessee's workers' compensation statutes and caselaw is in order.

Generally, the Tennessee Workers' Compensation Law requires all employers with five or more employees, with certain exceptions, to provide workers' compensation coverage for their employees. Tenn. Code Ann. § 50-6-106(5); *see King*, 2006 WL 2792159, at *4; *Jo Ann Forman, Inc. v. Nat'l Council on Comp. Ins., Inc.*, 13 S.W. 365, 366 (Tenn. Ct. App. 1999). "Workers' compensation insurance policies are contracts between the insurer and the

employer, by which the insurer, in return for a premium, agrees to indemnify the employer against all liabilities arising under the workers' compensation law." *Jo Ann Forman,* 13 S.W.3d at 366. "[T]he provisions of the Workers Compensation Law must be read into every policy of workers compensation insurance." *King*, 2006 WL 2792159, at *5; *see Hartford Underwriters Ins. Co. v. Penney*, No. E2009-01330-COA-R3-CV, 2010 WL 2432058, at *4 (Tenn. Ct. App. June 17, 2010) ("In Tennessee, any inquiry into an individual's employment status for workers' compensation insurance coverage necessarily is guided by overlapping state workers' compensation law.").

Workers' compensation insurance policies must be construed in light of the purpose of the workers' compensation statutes. "The purpose of the Workers Compensation Law . . . is to provide a reliable and equitable remedy to workers who are injured on the job, while limiting the liability to which the employer is exposed." *King*, 2006 WL 2792159, at *4. To further that purpose, an employer whose operations fall within the scope of the law must either maintain a policy of insurance to secure *any possible workers' compensation liability* or, alternatively, meet the stringent financial requirements necessary to maintain the status of a self-insured employer. *See id.*; *see also Penney*, 2010 WL 2432058, at *4.

On appeal, MVT does not dispute that it is covered by Tennessee's Workers' Compensation Law, nor does MVT dispute that it is required to maintain an insurance policy "to secure any possible workers' compensation liability."[18] MVT in fact procured the Zurich Policy in order to comply with this statutory obligation. The question on appeal centers on whether MVT owes retrospective insurance premiums on the policy based on the payrolls of the Tennessee-resident over-the-road drivers.

We note that the retrospective rating provision in the Zurich Policy is a standard provision in workers' compensation insurance policies. These provisions are based on the reality that "any number of employees may be hired or terminated while the policy is in effect, thus increasing or decreasing the amount of risk to which the insurer is exposed." *King*, 2006 WL 2792159, at *6. As demonstrated in this case, however, the retrospective rating method of premium computation requires cooperation between the insurance company and the insured employer. Both the insurance company and the insured employer have responsibilities in the required retrospective premium audit. When disputes arise, given that the purpose of the Workers' Compensation Law is to provide a reliable remedy for injured workers, the burden is on the insured employer to establish that its workers should be excluded from premium consideration. One commentator has explained:

---

[18]MVT does not claim that it met the financial requirements to be a self-insured employer.

In most retrospective rate situations, the insured is required to provide the insurer with various documentation. If the information is incorrect, the insured runs the risk of having the insurance cancelled.

Disputes may arise between the parties over the particular factors employed in calculating the retrospective rate. For example, the parties may disagree about the actual number of employees of the insured, whether particular goods were excluded from coverage, and whether the insurer lost the right to claim a particular loss item. Should one or more of these factors be called into question, the burden ordinarily falls on the insured, who usually has custody of the relevant information, to establish that it should be excluded from premium consideration.

5 *Couch on Ins. 3d*, **supra**, § 69:15 (footnotes omitted). In a retrospective premium audit, the issue is not whether the worker would have certainly been covered had he filed a claim on the insurance policy; rather, the audit is an after-the-fact analysis designed "to examine the actual risk which [the insurance company] undertook during the policy period." ***Royal Ins. Co. v. R&R Drywall, Inc.***, No. M2002-00791-COA-R3-CV, 2003 WL 21302983, at \*4 (Tenn. Ct. App. June 6, 2003) (quoting the trial court decision).

The parties have cited no Tennessee case in which an insurance carrier sought retrospective premiums for an insured's extraterritorial employee residing in Tennessee, and we have found none. On several occasions, however, this Court has addressed an insurance carrier's demand for retrospective premiums from an insured employer based on their employment of subcontractors, where the insured employer claimed that the subcontractors were independent contractors, not included in the calculation of the insured's workers' compensation insurance premium. A review of those cases is helpful to our analysis.

In ***CNA (Continental Casualty) v. King***, the insured, Mr. King, owned and operated a roofing business. ***King***, 2006 WL 2792159, at \* 1. Mr. King had no employees, but instead used subcontractors almost exclusively to perform the roofing work on his jobs. For the roofing job in question, Mr. King was required to furnish proof of workers' compensation insurance. To fulfill this requirement, Mr. King purchased a workers' compensation policy from the plaintiff insurance company. Like the policy in the instant case, the policy in ***King*** provided for a retrospective rating method of determining premiums at the expiration of the policy period. ***Id.*** at \*2. The policy required Mr. King to pay an insurance premium for all employees and uninsured subcontractors, with the proviso that he could avoid that obligation if he provided proof to the plaintiff insurance company "that the employers of these persons lawfully secured their workers compensation obligation." ***Id.*** at \*1.

To obtain the insurance coverage, Mr. King filled out a questionnaire for the plaintiff insurance company. The questionnaire asked, among other things, whether he would be using subcontractors for the roofing job at issue. Mr. King did not answer in the affirmative. Despite this, Mr. King in fact used six subcontractors on the job. He did not pay insurance premiums for the six uninsured subcontractors he used, and did not identify them as employees or uninsured subcontractors in the questionnaire.

When the plaintiff insurance company performed an audit, it learned that Mr. King had employed the subcontractors but did not identify them in the questionnaire. The insurance company promptly cancelled the policy. After a retrospective premium audit, the insurance company assessed Mr. King an additional premium of $14,790, based on his employment of the uninsured subcontractors. Mr. King refused to pay, and the insurance company filed a lawsuit to collect the premium. *Id.* at *2.

At trial, Mr. King testified that he did not pay additional premiums for the six subcontractors because he believed that they were independent contractors for whom he was not required to maintain workers' compensation coverage. *Id.* at *3. After a trial, the trial court made a finding of fact that Mr. King's workers were, in fact, independent contractors. However, it also observed that the issue was not clear cut and that "it would have taken a lawsuit to establish the true status of the workers." *Id.* at *4. The trial court concluded that the insurance company "would have been required by its contract to defend such a suit in any case, and that the suit could have gone either way with regard to the status of these employees." *Id.* Moreover, the insurance contract provided a means by which Mr. King could have legitimately excluded those workers from coverage under Mr. King's policy — by providing proof that the workers' employers had secured their workers' compensation obligation — but he did not do so. Therefore, because the insurance company had been exposed to liability on account of Mr. King's workers, the trial court granted the insurance company's claim for retrospective premiums. *Id.* Mr. King appealed.

On appeal, Mr. King's main argument was that the evidence established that the six workers were independent contractors, not employees. In response, the insurance company argued that, had one of the workers filed an on-the-job injury claim against Mr. King, the insurance company would have been required "to defend against the claim, to bear the risk that the worker would be found to be a statutory employee under Tenn. Code Ann. § 50-6-113, and to pay whatever benefits the worker was entitled to." *Id.* at *7. Thus, the insurance company argued, it bore "the risk to defend any claim brought by a worker on the job site even if that defense was to prove the injured worker was an independent contractor." Therefore, the insurance company contended, it had had a risk of loss for these workers during the policy period. *Id.* The appellate court agreed, concluding that the insurance company was justified in including in the premium base the payroll of the subcontractors, particularly in light of the

fact that Mr. King could have avoided the assessment by providing the necessary information to the insurance company. *Id.*

Retrospective insurance premiums were also considered in *Hartford Underwriters Ins. Co. v. Penney*, in which Mr. Penney, a home builder, purchased a workers' compensation policy from the plaintiff insurance company. *Penney*, 2010 WL 2432058, at \*1. Mr. Penney paid a premium only for himself for the one-year period of the policy, and he filed no claims during that time. During the policy period, Mr. Penney had used three subcontractors in the construction of a home.[19] Those workers had signed I-18 forms, swearing that they did not want to be covered under Mr. Penney' workers' compensation policy.[20] Based on these I-18 forms, Mr. Penney did not pay a workers' compensation insurance premium for those workers. *Id.* at \*1 & n.2. In its subsequent retrospective premium audit, the insurance company determined that premiums were due for these workers and assessed Mr. Penney accordingly. Mr. Penney refused to pay, relying on the I-18 forms and his characterization of the workers as independent contractors. The insurance company sued Mr. Penney for the retrospective premiums. *Id.* at \*3.

At trial, Mr. Penney testified in support of his assertion that the three workers were independent contractors, not employees, insisting that he did not control any aspect of their work. Describing the issue as a "close case" on the facts, the trial court concluded that the workers were employees, not independent contractors. Accordingly, it granted the insurance company's claim for retrospective premiums. *Id.* at \*4. Mr. Penney appealed.

On appeal, the appellate court noted the established rule that any doubt as to a worker's status must be resolved in favor of finding that the worker is an employee who is entitled to workers' compensation insurance coverage. *Id.* at \*4-5; *see Armstrong v. Spears*, 393 S.W.2d 729, 731 (Tenn. 1965). It reasoned: "The workers' compensation law is to be 'rationally but liberally construed to promote and adhere to the Act's purposes of securing

---

[19]A fourth subcontractor was also used, but he did not file an I-18 form, and it was undisputed that he was an employee and that Mr. Penney owed an additional premium payment for the subcontractor. *Penney*, 2010 WL 2432058, at \*1.

[20]According to the *King* court, I-18 forms are actually titled "Election of Non-Coverage by Sub-Contractor" and must be signed by both the subcontractor and the general contractor. Although they provide a mechanism whereby a subcontractor can waive his own right to be covered by the Workers' Compensation Law, the form itself states that he cannot waive the rights of his employees. *King*, 2006 WL 2792159, at \*2 & n.3. The insurance policy in *Penney* contained a provision stating that an I-18 form was "simply a statement of your intention not to cover these individuals. It is not a form recognized in the Tennessee Workers' Compensation Law and it does not resolve the fundamental issue of whether these individuals are working for you as sole proprietors/partners or as employees." *Id.* at \*2.

benefits to those workers who fall within its coverage.'" ***Penney***, 2010 WL 2432058, at *6 (quoting ***Hodge v. Diamond Container Gen., Inc.***, 759 S.W.2d 659, 664 (Tenn. 1988)). Given this liberal construction, the appellate court affirmed the trial court's factual finding that the three workers involved were employees, not independent contractors.

The appellate court in ***Penney*** then discussed the effect of the I-18 forms executed by the workers. It noted the language in Tennessee Code Annotated § 50-6-114(a), stating: "No contract or agreement . . . shall in any manner operate to relieve any employer in whole or in part of any obligation created by this chapter . . . ." ***Id.*** at *7. It stated that the contractors' liability for premiums was not determined by the workers' employment relationship or the execution of an I-18 Form, but rather, it was determined by the insurance contract itself. ***Id.*** at 8. Applying the reasoning in ***King***, the ***Penney*** court held that the insurance carrier's potential liability under the policy was "a sufficient basis for enforcing [the insurance carrier's] additional premium assessments." ***Id.*** at *9. The appellate court observed: "If any of these workers had been injured on the job, they could have submitted a claim for workers' compensation that Mr. Penney would have had to answer as the arguable employer, irrespective of the executed I-18 Forms." ***Id.*** The insurance company "undertook the risk during the policy period, including the risk that it would have to defend Mr. Penney as the insured in a suit to establish a definitive determination as to the employment relationship between Mr. Penney with the injured worker." ***Id.*** On this basis, the appellate court affirmed the trial court's decision, holding Mr. Penney liable for the retrospective premiums.

***King*** and ***Penney*** are instructive in our review of Zurich Insurance's claim for retrospective insurance premiums. Both cases emphasize that, where the insurance company was exposed to the risk of defending a workers' compensation lawsuit filed by a worker, even if only to litigate the worker's status, the assessment of retroactive premiums was warranted under the insurance contract. ***Penney***, 2010 WL 2432058, at *5; ***King***, 2006 WL 2792159, at *7-8; ***see also Hodge***, 759 S.W.2d at 664.

Against this backdrop, we turn to the facts in the case at hand. As this is a contractual dispute, we focus on the terms of the contract – the Zurich Policy. It provides that the "premium includes payroll . . . during the policy period for the services of" MVT's employees and "[a]ll other persons engaged in work that could make us liable" for workers' compensation benefits. Therefore, consistent with ***King*** and ***Penney***, the evidence need not show definitively that the disputed employees were in fact Tennessee drivers who were entitled to workers' compensation benefits under Tennessee law. Under the Zurich Policy, the issue is whether Zurich Insurance "could" have been liable for workers' compensation benefits for the Tennessee-resident over-the-road drivers.

-20-

Next we look at the parties' duties and responsibilities under the Zurich Policy. Paragraph E states explicitly that MVT's initial insurance premium is "an estimate," and that "[t]he final premium will be determined after this policy ends by using the actual, not the estimated, premium basis and the proper classifications and rates that lawfully apply to the business and work covered by this policy." Paragraph G of the Zurich Policy authorizes Zurich Insurance to "examine and audit" MVT's records and use the "[i]nformation developed by audit . . . to determine final premium."

MVT has duties under the contract as well. The Zurich Policy states that MVT must "keep records of information needed to compute premium." MVT must "provide [Zurich Insurance] with copies of those records when [it] ask[s] for them" and "let [Zurich Insurance] examine and audit all [of MVT's] records that relate to this policy." Numerous types of records are specified in the policy.

In sum, under the Zurich Policy, MVT is required to keep pertinent records and provide them to Zurich Insurance for audit. Zurich Insurance, in turn, determines the final premium based on the records provided to it by MVT. If Zurich Insurance uses methodology to determine the premium that is congruent with the policy and consistent with the records and information furnished by MVT, it has complied with its contractual obligation. If so, MVT owes the premium assessed.

We consider first MVT's arguments on Zurich Insurance's use of the NCCI guidelines in determining whether the payroll of the disputed drivers should be included in the premium calculation. MVT appears to argue that (1) the trial court erred in holding that the NCCI guidelines govern the issue, (2) the Zurich Policy says that the premium will be determined by Zurich Insurance's rules, so use of the NCCI guidelines was not permissible, and (3) there is a question of fact for trial as to whether the NCCI guidelines apply.

We respectfully disagree as to all of these arguments. The issue is not whether the NCCI guidelines "govern" the issues in the case. The issue is whether Zurich Insurance was permitted under the Zurich Policy to use the NCCI guidelines in its premium calculation. The Zurich Policy states: "All premiums for this policy will be determined by our manuals of rules, rates, rating plan and classifications." We do not read this as prohibiting Zurich Insurance from consulting the guidelines of NCCI, a national rating organization, to determine whether Zurich Insurance "could" be held liable for workers' compensation benefits for the disputed workers. We note that the same section of the Zurich Policy states specifically that "[i]nsurance rate service organizations" also have the right to examine and audit MVT's records for premium purposes. In its appellate brief, MVT itself refers to the NCCI guidelines as "optional." Zurich Insurance's use of the NCCI guidelines in this case is not contrary to the insurance contract.

MVT argues that the trial court erred in granting summary judgment to Zurich Insurance where MVT had notified Zurich Insurance that it intended to decline coverage for the disputed workers and utilize its OB Plan for those workers. It is undisputed that MVT's OB Plan is not a substitute for workers' compensation under Tennessee law, and the Texas OB Plan does not absolve MVT of its obligation to provide workers' compensation insurance for its Tennessee employees. *See* Tenn. Code Ann. § 50-6-114(a). Under those circumstances, MVT's notification to Zurich Insurance that it intended to decline coverage for the disputed employees is irrelevant, because it does not affect Zurich Insurance's exposure to risk as to those employees.

MVT takes umbrage at Zurich Insurance's insinuation that MVT "refused" to provide requested information, specifically, the drivers' logs for the employees at issue. Whether MVT did or did not "refuse" to prove such records is, at most, tangential to our analysis. At the end of the day, Zurich Insurance was tasked with using whatever information MVT provided to ascertain whether Zurich Insurance was at risk for the employees in question. The less information MVT provides, the less basis there is for Zurich Insurance to conclude that it is not at risk. As noted above, where the insurance company determines its premium through retrospective rating, "the burden ordinarily falls on the insured, who usually has custody of the relevant information, to establish that it should be excluded from premium consideration." 5 *Couch on Ins. 3d*, *supra*, § 69:15.

MVT insists on appeal that the employment status of each of the disputed over-the-road drivers must be established individually, examining the particular facts for each driver. We would be more receptive to this argument if the record indicated that, in the course of Zurich Insurance's retrospective audit, MVT attempted to demonstrate that individual drivers within the group presented no risk to Zurich Insurance. The record reflects the opposite, that representatives of both MVT and Zurich Insurance dealt with MVT's Tennessee-resident over-the-road drivers collectively. For the audit Mr. Lehrfeld conducted, Mr. Garcia testified that he was asked for various specified employment records for Tennessee employees, including the Tennessee-resident over-the-road drivers. Mr. Garcia questioned the request because Mr. Garcia believed that the over-the-road drivers were "not covered under workers' comp." Nevertheless, Mr. Garcia gave Mr. Lehrfeld the employees' records and answered some unspecified questions; Mr. Lehrfeld then "did his audit." After the audit came back unfavorably, Mr. Garcia said, MVT wrote Zurich Insurance a "dispute letter" taking the position that all of the Tennessee-resident over-the-road drivers should have been excluded. The reasons given for this position were common to all of the drivers; for example, that they all signed a form acknowledging that they are Texas employees, and they all understood that they had agreed to be covered under the Texas OB Plan rather than the Tennessee Workers' Compensation Act.

Our focus remains whether the undisputed facts establish that Zurich Insurance performed its contractual duty under the Zurich Policy to audit the information and records furnished by MVT and determine the retrospective premium.[21] In the course of such a retrospective audit, the burden is on MVT to establish exclusion from premium consideration. If MVT gave Zurich Insurance no indication in the audit that it felt that certain of the over-the-road drivers presented less risk to the insurance carrier than others, it cannot, in the ensuing litigation, ask the trial court to conduct a mini-trial on the circumstances of each individual driver.

Finally, MVT argues that summary judgment is inappropriate at this juncture because genuine issues of material fact exist as to whether the Tennessee-resident over-the-road drivers are actually Texas employees or Tennessee employees. It points out the many factors that are considered when making this determination, such as (1) the employees' state of hire, (2) the state from which their pay originates, (3) the state in which they spend the majority of their time, (4) the state in which they normally begin and end their runs, (5) the state in which they are reported for unemployment purposes, (6) the state where they were trained (orientation), and (7) the state in which their employment is principally located. With so many disputed issues of fact, MVT argues, summary judgment in favor of Zurich Insurance was not appropriate.

Respectfully, the presence of disputed facts as to these factors does not persuade us that the trial court erred in granting summary judgment to Zurich Insurance. We are mindful that the bar for Zurich Insurance is not high; under the terms of the Zurich Policy, it need only show that it "could" be liable for workers' compensation benefits for the disputed employees. Moreover, as we have emphasized, "the burden ordinarily falls on the insured, who has custody of the relevant information to establish" that the disputed employees "should be excluded from premium consideration." 5 *Couch on Ins. 3d*, **supra**, § 69:15.

Given the records and information produced by MVT in the retrospective premium audit, Zurich Insurance had little choice but to conclude that it "could" be liable to MVT's Tennessee-resident over-the-road drivers. It is undisputed that all of the Tennessee-resident over-the-road drivers lived in Tennessee, and that their employment was necessitated by MVT's establishment of a terminal in Tennessee to service its growing Tennessee client base. It is also undisputed that, for all of these employees, at least some of their work was performed in Tennessee. The lack of driving logs left Zurich Insurance with almost no

---

[21]For this reason, the cases cited in MVT's brief involving whether a particular trucker is entitled to workers' compensation benefits are inapposite.

information regarding the state in which these drivers spent the majority of their time.[22] The fact that the employees are hired and paid out of Texas, are trained in Texas, and are reported for unemployment purposes in Texas, does not remove the risk of exposure to Zurich Insurance under the Zurich Policy. Moreover, it is not insignificant that twenty similarly-situated MVT employees filed claims for their on-the-job injuries under the Zurich Policy during the first year of the policy's existence, and many of those were paid by Zurich Insurance without objection. *See King*, 2006 WL 2792159, at *10 (noting that, after the expiration of the policy period, Mr. King actually notified the insurance company of an on-the-job injury of one of his workers, "apparently expecting coverage").

Both *King* and *Penney* establish that the propriety of retrospective premiums must be determined by referring to the language in the insurance contract and the overlapping Workers' Compensation Law. The Zurich Policy in this case requires MVT to pay premiums based on the "payroll and all other remuneration paid . . . for the services of . . . [a]ll your officers and employees [and] [a]ll other persons engaged in work that could make us liable under Part One (Workers Compensation Insurance) of this policy." In return, Zurich Insurance is to provide workers' compensation insurance for "any possible workers' compensation liability." *Id.* at *4. Zurich Insurance is required to pay all covered claims and "to defend . . . any claim, proceeding or suit against you for benefits payable by this insurance." Given the undisputed facts of this case, Zurich Insurance was at risk of being required to defend MVT against a claim filed by one of MVT's Tennessee-resident over-the-road drivers, even if only to litigate the matter of coverage. Therefore, Zurich Insurance was entitled to include the payrolls of MVT's Tennessee-resident over-the-road drivers in its premium basis for the relevant policy periods. We find no error in the trial court's grant of summary judgment in favor of Zurich Insurance on its claim for the retrospective insurance premiums.

Accordingly, we affirm the grant of summary judgment in favor of Zurich Insurance. All other issues raised and not addressed herein are pretermitted by our decision.

---

[22]Even if MVT had produced driving logs in the trial court that supported its position, we would be loathe to say that they could be considered in the litigation. We are, after all, construing the parties' obligations under the insurance policy. Under the terms of the policy, MVT was obliged to produce such records *in the audit*, for calculation of the retrospective premium. If Zurich Insurance made a reasonable premium calculation based on the records produced, we are hard-pressed to see why MVT would be permitted to bring forth more records in the ensuing litigation. But we need not reach this issue.

**CONCLUSION**

The decision of the trial court is affirmed. Costs on appeal are to be taxed to Appellant MVT Services, Inc., d/b/a Mesilla Valley Transportation, and its surety, for which execution may issue, if necessary.

_____
HOLLY M. KIRBY, JUDGE